United States District Court
Western District of New York

United States of America,

*Plaintiff*

*vs*

Steve Jabar and Deborah Bowers,

*Defendants*

**Defendants' Rule 29 Motion**

09-Cr-170-V

Dated:  August 18, 2016

Patrick J. Brown, Esq.
LOSI & GANGI
147 Linwood Avenue
Buffalo, New York 14209
(716) 854-1446
pjbrown@Losi-Gangi.com

Mark J. Mahoney
HARRINGTON & MAHONEY
70 Niagara Street, 3rd Floor
Buffalo, NY   14202-3407
Ph: 716-853-3700 (fax)
Facs: 716-853-3710

*(Attorneys for Steve Jabar and Deborah Bowers)*

# Contents

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

       Cases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

       Other Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

The standard for granting a Rule 29 Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

The government has offered no evidence of intent to cause economic harm to the UN. . . 2

The government has offered no evidence that Mr. Jabar made the representations alleged
     in the indictment.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     A.    What the indictment alleges to be the false representations . . . . . . . . . . . . 4

     B.    The fraud was complete with the disbursement of $350,000. . . . . . . . . . . 5

     C.    The government has failed to prove that the representations alleged in the
          indictment were made by Mr. Jabar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Even if Mr. Jabar had read the agreement, and was legally bound by it, there is no
     evidence that his last minute acquiescence to changes insisted on by the UN was in
     furtherance of the charged scheme. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

The government cannot get to the jury by shifting to a different theory of false
     representations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

     A.    Shifting to a theory of misrepresentations contained in the application for
          the grant would be fatal variance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

     B.    In any event, there is no evidence that any of the representations in the grant
          application are false. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

     C.    Even if particular representations in the grant application were considered
          false, their materiality has not been substantiated in the context of wire
          fraud. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

The §1001 Charges in the indictment fail in other dispositive ways. . . . . . . . . . . . . . . . 12

     A.    The materiality of the false statement charges has not been substantiated
          . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     B.    The jurisdictional element in the false statements charges has not been
          substantiated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

C.      The evidence of intent to deceive is missing. . . . . . . . . . . . . . . . . . . . . . . 14

Subsequent "misapplication" of funds cannot substitute for proof of specific intent. . . . 14

The government should not be allowed to shift to a "theft" theory . . . . . . . . . . . . . . . 17

"Financial difficulties" may only, and only sometimes, be used as evidence of "motive" –
       but not more. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
      A.      Proof of urgent financial distress may be considered as evidence of
              "motive" where motive is material. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
      B.      The relevance of motive is not shown. . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
      C.      "Motive," no matter how strong or urgent, cannot be substituted  for the
              proof of the specific intent to misrepresent or to cause harm that is required
              in a case of fraud. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# Table of Authorities

## Cases

*United States v. Silverman*, 430 F.2d 106 (2d Cir. 1970). . . . . . . . . . . . . . . . . . . . . . . . . 9

*Connors v. Fawn Mining Corp.*, 30 F.3d 483 (3d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . 8

*Cosby v. Jones,* 682 F.2d 1373 (11th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Epstein v. United States*, 174 F.2d 754 (6th Cir. 1949). . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Jackson v. Virginia*, 443 U.S. 307 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Mack Univ. LLC v. Halstead*, No. SA CV 07-0393 DOC, (C.D. Cal. Nov. 14, 2007). . . 22

*O'Kinsky v. Perone*, CIVIL ACTION NO. 10-6075,
2012 BL 182032 (E.D. Pa. Apr. 20, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Powers v. British Vita, P.L.C.*, 57 F.3d 176 (2d Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . 22

*Pu v. Charles H. Greenthal Management Corp.*, 2010 WL 774335 (S.D.N.Y. 2010). . . 22

*Reich v. Lopez*, 2015 BL 103806, 4 (S.D.N.Y. Apr. 13, 2015). . . . . . . . . . . . . . . . . . . . 2

*Russell Publ'g Grp., Ltd. v. Brown Printing Co.*, No. 13 Civ. 5193 (S.D.N.Y. Feb. 05, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Stirone v. United States*, 361 U.S. 212 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, --- F.3d ----,
2016 WL 2956743 (May 23, 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Adekanbi*, 675 F.3d 178 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Ajayi*, 808 F.3d 1113 (7th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Ansaldi*, 372 F.3d 118 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Autuori*, 212 F.3d 105 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Cassese*, 290 F. Supp. 2d 443 (S.D.N.Y. 2003). . . . . . . . . . . . . . . . . . 15

*United States v. Cirillo*, 468 F.2d 1233 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Clemente*, 22 F.3d 477 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Crowley*, 79 F. Supp. 2d 138 (E.D.N.Y. 1999). . . . . . . . . . . . . . . . . . . . 9

*United States v. Eaton*, 501 F.2d 77 (5th Cir. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Gaudin*, 515 U.S. 506 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Glenn*, 312 F.3d 58 (2d Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . 2, 15

*United States v. Guevara*, 277 F.3d 111 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Lander*, 668 F.3d 1289 (11th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. McKeon*, 738 F.2d 26 (2d Cir. 1984)............................ 6

*United States v. Mitchell*, 172 F.3d 1104 (9th Cir. 1999). ....................... 19

*United States v. Mullings*, 364 F.2d 173 (2d Cir. 1966), 364 F.2d 17................ 19

*United States v. Ratliff-White*, 493 F.3d 812 (7th Cir. 2007)....................... 9

*United States v. Reeder*, 170 F.3d 93 (1st Cir. 1999). ........................... 10

*United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003). ....................... 2, 12

*United States v. Santos*, 553 U.S. 507 (2008). .................................. 5

*United States v. Stewart*, 305 F.Supp.2d 368 (S.D.N.Y. 2004).................... 15

*United States v. Stewart*, 433 F.3d 273 (2d Cir.2006)........................... 12

*United States v. Vebeliunas*, 76 F.3d 1283 (2d Cir. 1996)....................... 10

*United States v. Walsh*, 195 F. 3d 37 (2d Cir. 1999)............................. 9

*Virgin Islands v. Aquino*, 378 F.2d 540 (3d Cir. 1967).......................... 10

*West 79th Street Corp. v. Congregation Kahl Minchas Chinuch*, 2004 WL 2187069
(S.D.N.Y. 2004)................................................... 22

## Other Authorities

41 Am. Jur. 2d Indictments and Informations § 261........................... 10

# Introduction

We move for dismissal of the wire fraud and money laundering counts pursuant to Rule 29. Principally, the entirety of the government's palpable evidence is the precise kind of "breach of contract" evidence that the Second Circuit, in *Countrywide Homes*, declared ineligible to serve as a basis for a finding of fraud. Also, the government has failed to adduce any evidence that the claimed false representations recited in the indictment were made by Mr. Jabar in seeking the UN grant. And its efforts to vary the proof to insinuate a different set of "misrepresentations" utterly fails factually, even if it were constitutionally permissible. The government, focusing entirely on its "misspending" theory of wrongdoing, has deliberately avoided trying to establish that there was any actual economic harm intended to the UN: it offered no proof that it did not get the radios station it was promised.

Additionally, the §1001 counts fail because, with no evidence of actual fraud, the "misspending" of funds was not a federal offense and so the "matter" about which the defendants spoke was not "within the jurisdiction of the . . . United States." Additionally, the evidence is clear that the statements of both defendants were not of the material type which could have influenced to investigation which had already settled on the facts it was interested in and was focused only on eliciting evidence of lying or guilt.

# The standard for granting a Rule 29 Motion

A motion for a judgment of acquittal must be granted if, after viewing all of the evidence, in the light most favorable to the prosecution, no rational trier of fact could find that the required elements of each offense were proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Of course this doesn't mean that the court only looks at the *evidence* favorable to the government. All the evidence must be reviewed, but with close calls regarding credibility and weight being resolved in favor of the government.

1

Although the Government is not required to negate every theory of innocence, *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000), equal or nearly equal levels of circumstantial evidence supporting theories of guilt and of innocence cannot support a conviction as the jury must then have contemplated a reasonable doubt. See *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir.2002).

Here, on each count of conviction, any rational juror must have had a reasonable doubt about the guilt of Steve Jabar and Deborah Bowers.

# The government has offered no evidence of intent to cause economic harm to the UN

Intent to cause economic harm to the UN is an essential element in this case. *United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003); *Reich v. Lopez*, 2015 BL 103806, 4 (S.D.N.Y. Apr. 13, 2015)("Consequently, while there may be intent to harm, there is no intent to obtain property from Plaintiffs, and there is no scheme to defraud within the wire fraud statute." )

The government has not proven, or endeavored to prove, that the UN got less than what it expected. The government readily admits that the UN received the radio station for which it contracted with OKI.  The radio station that was contemplated in the Institutional Contract of November 25, 2004 and in the other agreements drafted by the UN which have signatures on a separate signature page, was actually built. None of the UN witnesses suggested otherwise.  There was not a single bit of evidence that any of the components of the project specified in the budget had not been purchased and implemented.

The expenditures on the radio station exceeded what the UN gave to OKI according to the quarterly report which has not been proven to be false.  The government has not undertaken to prove that the UN did not get exactly what it bargained for.  Indeed, the

2

government has deliberately chosen a myopic view of the case, focusing only on the "misspending of funds" as its theory of what was "wrong," to the complete exclusion of looking at the project itself that the UN had bargained for.  So, the government's focus on the quarterly report – not with the UN witnesses – was on whether it listed the "misspending" items.  But this was not with the UN witnesses who testified that the quarterly report is only for "expenditures" made on the project, and not to "trace the money."

While there were vague programming complaints and unspecified claims about questionable expenditures or the failure to provide receipts, no effort was made to translate these complaints about the *accounting* for the radio station project into any proof of the kind of economic harm necessary under §1343.

# The government has offered no evidence that Mr. Jabar made the representations alleged in the indictment.

The indictment is very specific about the "representations" at issue in the fraud allegations.  The government has utterly failed to prove that he actually *made them* at any time pertinent to the decision to grant the money, without regard to whether or not there is any evidence that the representations might have been "false."

## A.   What the indictment alleges to be the false representations

The indictment refers to the "Standard Project Cooperation Agreement" [Ex. 12B] as containing the "representations" at issue. Indictment ¶¶8-10.  Specifically, the following:

3

| | |
|---|---|
| Art. VIII, ¶1 | The second and subsequent installments will be advanced to [OKI] quarterly every three months, when a financial report and other agreed-upon documentation, for the activities completed have been submitted to and accepted by UNIFEM as showing satisfactory management and use of UNIFEM resources. |
| Art. VIII, ¶2 | to utilize the funds and any supplies and equipment provided by UNIFEM in strict accordance with the Project Document. [OKI] will report on the first installment by (31st March 2005) in order to ensure timely disbursement of second installment. |
| Art. IX, ¶10 | keep accurate and up-to-date records and documents in respect of all expenditures incurred with the funds made available by UNIFEM to ensure that all expenditures are in conformity with the provisions of the Project Work Plan and project Budgets. |

This articulation of the "representations" is exclusively reiterated by the government over and over before trial. [Dkts. #65 p.4; #138 p.16; #139 p.2; #141 p.1; # 277 p. 13; #351 p.2-3]   The indictment further demonstrated the these are the representations at issue.  It alleges  in ¶14 that:

> the defendants, having *obtained grant money* from UNIFEM *by*: (a) representing that all money would be acquired and used by the not-for-profit corporation OKI for the purpose of establishing and running a radio station in the country of Iraq; and (b) agreeing to the terms and conditions set forth in the UNIFEM

This pinpoints the representations *alleged to have been used to deceive the UN and obtain its property* as being those in the earlier paragraphs in Art. VIII and IX of the agreement which contain the sole source of this distillation of the representations.  It is unmistakable in the indictment that the scheme was to obtain funds by means of these representations. Fraud is not merely a larceny *accompanied* by false statements, but an unlawful taking accomplished *by means of the alleged false statements*.  The indictment alleges that with specificity.

The character of these representations is also very specific.  The representations deal

4

exclusively with the use of the UN funds and record keeping and reporting in order to obtain additional funds beyond the $350,000 that was due and paid immediately.

The only reference in the indictment to the submissions made by OKI to the UN is in ¶7, as follows:

> The defendants' written proposal represented that the radio station would promote the principles of democracy and women's rights in Iraq, and eventually would be known as the "Voice of Women Radio" and/or "Radio Almahaba."

## B.   The fraud was complete with the disbursement of $350,000

In order to decide the question of what "representations" are relevant, it is useful to have a clear idea of the scope of the fraud allegation.  The government has staked out two very important positions that frame the "scheme to defraud" for this case.  First, the indictment alleges that the fraud occurred at the time of the applying for U.N. funds in early 2004.  Pretrial Memos, Dkt. 138, p. 27; Dkt. 277, p. 21 ("The government's view is that the wire fraud occurred when the defendants first sought to obtain the grant money").  At the other end, The government has taken the express position that the "fraud" was "complete" at the moment that the U.N. funds were received. Gov't Response in Opposition To Defendants' Motion in Limine, Dkt. 148, p.10. ("Thus, the wire fraud criminal activity alleged in the Indictment was completed upon receipt of the UNIFEM funds.").  The government took this position in specific response to our motion to dismiss the money laundering counts, which could not survive if the financial transactions resulting in the alleged  payments to Jabar and Bowers were considered as part of the fraudulent conduct. *See, United States v. Santos*, 553 U.S. 507 (2008).   Of course, the government is bound by these judicial admissions.  *United States v. McKeon*, 738 F.2d 26, 27-34 (2d Cir. 1984); *Stirone v. United States*, 361 U.S. 212, 216-17 (1960).

We have reiterated this point, on the record and in our pleadings, several times. [Dkts. 121; 148 p.10; 277 p. 21; 308 p. 9; 353 p. 42 n.3] These admissions form the basis of our

Proposed Jury Instruction No. 35. [Dkt. 353 p. 42].  In its objections to the defense proposed jury charge, the government does not challenge this point. Dkt. 369 pp. 6-7.[1]

As a result, the conspiracy also is deemed to be completed when its object, the fraud is complete, with the receipt of the $350,000.  Moreover, as Mr. Guha pointed out, the representations attributed to the Standard Project Cooperation Agreement only related to whether the additional $150,000 would be released.  The first $350,000 came simply on the basis of signing the agreement.  Therefore, even if there were representations in the quarterly report, which the government has also not proven, those representations could only go to the possibility of a different scheme to defraud in relation to the $150,000.

## C.   The government has failed to prove that the representations alleged in the indictment were made by Mr. Jabar

The evidence establishes that there was an Institutional Contract executed by the UNIFEM Field Office Director and Mr. Jabar, that latter signing on November 25, 2004.  EX207C.  That agreement, as testified to by both U.N. witnesses Mr. Guha and Ms. Sandler and on its face, called for the distribution of $350,000 upon signing that agreement and a balance of $150,000 upon delivery of the equipment for the radio station.  The UN does not consider the agreement binding on it, since it had not been approved by the UNIFEM director.  Nevertheless, Mr. Guha agreed with the obvious fact that the agreement expressed the intentions of Mr. Jabar and the Field Office at the time.

That institutional contract, which Mr. Guha referred to as a "procurement" type agreement, involves no promises other than to provide the radio station described in the contract.  It contains no promises to the effect the funds obtained from the UN would be used solely as a dedicated fund to pay for the radio station, no promises to keep any kind of

---

[1]  Similarly, the government does not challenge proposed defense instruction no. 49 on the impropriety of using evidence of breach of contract to prove fraud.  *Compare* Dkt. 353 p. 61 *with* Dkt. 369 pp. 6-7.

records, or to report quarterly or otherwise to the U.N. about anything.

From the UN point of view, this understanding changed when the Institutional Contract was forwarded to UNIFEM headquarters in New York where it was initially thought that such a "procurement" contract would require competitive bidding, at least. On further review and input from OKI and Bushra Samarai, the UNDP Program Coordinator for Iraq and the UNIFEM field office director, the Program Approval Committee recommended the project with the addition of some management protocols and the introduction of financial controls and quarterly payments with respect to the $150,000 balance of the grant. The $350,000 would be disbursed in the same fashion as the Institutional Contract: upon signing.

However, the revelation made by Mr. Guha, the government's very first witness, was that there was no evidence that Mr. Jabar ever saw the terms of the Standard Project Agreement incorporating these new terms , including the terms charged in the indictment as the false representations. Jabar only signed signature pages that were sent to him by email from Shatha Amin of UNIFEM in Amman. There is no evidence that he, or Debbie Bowers, were advised of the changes to be made in the arrangement. Called several days later, the UN witness Sandler, had nothing additional to offer. And the funds were disbursed on the following day, December 14, 2004, the day the government agrees that any fraud was "complete."

As a result of this, there is no evidentiary support for the allegation that Mr. Jabar made the representations actually charged. Signing a signature page alone, on a "take it or leave it" basis, under time constraints, cannot even be taken as agreement to the new terms introduced by the drafting party, and certainly cannot amount to a fraudulent misrepresentation. In a civil case seeking to enforce a contract, where the party that does not draft the contract and signs only a signature page or the subsequent written agreement differs from a previous oral one, it is considered "excusable ignorance" and the contract cannot be enforced against the ignorant party. *See Connors v. Fawn Mining Corp.*, 30 F.3d 483,

7

490-93 (3d Cir. 1994); *O'Kinsky v. Perone*, CIVIL ACTION NO. 10-6075., 2012 BL 182032 (E.D. Pa. Apr. 20, 2012). The time pressures the defendants were under,  the "take it or leave it" reality of the contract, and the fact that the defendants were provided only with a signature page, establish that the contract, insofar as the terms relevant here, was a contract of adhesion and that the defendant's ignorance of its terms is excusable - the defendants did not violate it.

In these circumstances where there was hardly an agreement - the defendants signed only a signature page - the UN could hardly claim that the terms it subsequently inserted - there is no evidence that the defendants were aware of those terms - were representations made by the UN which induced the UN to enter into the agreement.

# Even if Mr. Jabar had read the agreement, and was legally bound by it, there is no evidence that his last minute acquiescence to changes insisted on by the UN was in furtherance of the charged scheme

Mr. Guha testified that the added provisions regarding keeping records and sending quarterly reports only related to the obtaining of the $150,000 installment following the initial payment of $350,000.  The initial payment of $350,000 was automatic upon signature, and merely replicated the earlier Institutional Contract which was a simple procurement contract requiring  OKI to establish the  radio station, with no provisions suggesting that the funds had to be the dedicated source of purchasing the equipment, etc.  The  $350,000 was not conditioned upon the financial reporting to which the government has drawn attention. If any fraud did occur, if there was any attempt to dupe the UN by creating false financial reports, it could only have related to the remaining $150,000, but the government has not alleged that.  That would be a separate scheme, as stated above in section "D."

# The government cannot get to the jury by shifting to a different theory of false representations

## A. Shifting to a theory of misrepresentations contained in the application for the grant would be fatal variance

Compliance with Rules 7(c) and 7(f):

> fulfills the Sixth Amendment right to be informed of the nature and cause of the accusation; it prevents a person from being subject to double jeopardy as required by the Fifth Amendment; and it serves the Fifth Amendment protection against prosecution for crimes based on evidence not presented to the Grand Jury.

*United States v. Walsh*, 195 F. 3d 37,  44 (2d Cir. 1999); *United States v. Crowley*, 79 F. Supp. 2d 138, 153-54 (E.D.N.Y. 1999).  See also, *United States v. Silverman*, 430 F.2d 106, 110 (2d Cir. 1970) (analyzing evidence to "insure that the defendant was not tried upon a theory or evidence which was not fairly embraced in the facts upon which the grand jury based its charges"), modified, 439 F. 2d 1198 (2d Cir. 1970).

A "fatal variance" occurs "when the defendant is prejudiced in his defense because he cannot anticipate *from the indictment* what evidence will be presented against him . . . ." *United States v. Ratliff-White*, 493 F.3d 812 , 820 (7th Cir. 2007) (*emphasis added*). "When . . . *the indictment* gives a defendant particular notice of the events charged, and the proof at trial centers on those events, *minor differences in the details of the facts* charged, as contrasted to those proved, are unlikely to be either material or prejudicial." *United States v. Reeder*, 170 F.3d 93, 105 (1st Cir. 1999); *United States v. Ajayi*, 808 F.3d 1113, 1125 (7th Cir. 2015).

A constructive amendment is not permitted at trial; it requires reversal without regard to prejudice.  *United States v. Ansaldi*, 372 F.3d 118, 127 (2d Cir. 2004); *United States v. Clemente*, 22 F.3d 477, 482 (2d Cir. 1994). A constructive amendment effectuated by a

variance of the indictment stands as an acquittal of the original charges. *Epstein v. United States*, 174 F.2d 754 (6th Cir. 1949); *United States v. Eaton*, 501 F.2d 77 (5th Cir. 1974); *Virgin Islands v. Aquino*, 378 F.2d 540 (3d Cir. 1967); 41 Am. Jur. 2d Indictments and Informations § 261.

Constructive amendment of an indictment is a "serious error." *United States v. Ansaldi*, 372 F.3d 118, 126 (2d Cir. 2004). It occurs when the "government's presentation of evidence and the district court's instruction combine to 'modify essential elements of the offense charged to the point that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged by the grand jury.'" *United States v. Vebeliunas*, 76 F.3d 1283, 1290 (2d Cir. 1996) (quoting *United States v. Clemente*, 22 F.3d 477, 482 (2d Cir. 1994)).

Here, the government asked questions intimating that the documents submitted to the UN somehow may have been inaccurate. If the government were allowed to actually argue these representations as a basis for wire fraud, this would be a constructive amendment of the indictment. Not only is this clear from the face of the indictment, we also know from Agent Klimczak's testimony before the grand jury that nothing was suggested that the the contents of the VOW proposal were material misrepresentations.

The prohibition on a constructive amendment of the indictment certainly applies to changes in the specific material misrepresentations alleged in the indictment. *See United States v. Lander*, 668 F.3d 1289, 1295-1297 (11th Cir. 2012) (Finding constructive amendment where indictment alleged defendant misrepresented necessity of bond purchase, but at trial sought to convict based on representations that defendant could circumvent regulatory process for developers.) if the court were to allow the government to prove some representations other than those specified in the indictment, it would create

> "a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." United States v. Delano, 55 F.3d 720, 729 (2d Cir.1995) (quoting United States v.

> Mollica, 849 F.2d 723, 729 (2d Cir.1988) (internal quotation marks
> omitted)). "A constructive amendment is a per se prejudicial violation
> of the Grand Jury Clause of the Constitution." Thomas, 274 F.3d at
> 669; United States v. Frank, 156 F.3d 332, 338 n. 5 (2d Cir.1998).

*United States v. Guevara*, 277 F.3d 111 (2d Cir. 2001).

## B.   In any event, there is no evidence that any of the representations in the grant application are false

After the many questions insinuating that there might be misrepresentations in the materials submitted in support of the VOW grant application, and the numerous objectios made to what appeared to be an attempt to constructively amend the indictment, there was finally nothing in those materials proven to be false, and known by with to be false at the time they were made.

So, was it true or false that there were 11 members of any of the "boards" referred to in the application?  There was no evidence on this or any other of the allusions to the grant application. Of course the grand jury did not address this – it was presented with no evidence concerning the correctness of any statements in the grant application.

## C.   Even if particular representations in the grant application were considered false, their materiality has not been substantiated in the context of wire fraud

A representation or promise, is "material" if, when it was made, it would have the natural tendency to influence the UN in deciding whether to approve the grant of funds. *United States v. Rybicki*, 354 F.3d 124, 147 (2d Cir. 2003) ("where the misrepresentations (or omissions) made by the defendants are material in that they have the natural tendency to influence or are capable of influencing the employer to change its behavior").  The government has failed to prove how, from the viewpoint of the United Nations, in these circumstances, any particular statement which could potentially have beenn incorrect about eh organization of OKI or its internal governance, or otherwise, might have been material to

11

the United Nations in its decision to grant OKI the money.

# The §1001 Charges in the indictment
# fail in other dispositive ways

Other important elements of the §1001 charges are actually disestablished by the evidence.

## A. The materiality of the false statement charges has not been substantiated

A statement is material if, under the circumstances, "it has a natural tendency to influence, or [be] capable of influencing, the decision of the decision making body to which it was addressed,  or if it is capable of distracting government investigators' attention away from a critical matter." *United States v. Adekanbi*, 675 F.3d 178, 182 (2d Cir. 2012) *citing United States v. Gaudin*, 515 U.S. 506, 509 (1995); *United States v. Stewart*, 433 F.3d 273, 318 (2d Cir.2006) (internal quotations omitted).

By the time Agent Klimczak interviewed Debbie, his mind was made up. Although he denies he was seeking a lie, Agent Klimczak admits that, at the time of the interview, he was already aware of the path of the $350,000 grant, and that Ms. Bowers' response to his inquiry in that regard would not change his course of investigation or change his belief that the funds were misused. Agent Klimczak testified that he already knew the answer to the question he posed to Ms. Bowers which elicited the statement that is the subject of the §1001 claim. This admission negates the necessary element of § 1001 that the false statement was material to [§1001 language]  There is an important distinction between a lie that a juror thinks could have affected the investigation, from a lie that actually influenced Agent Klimczak to pursue a particular course of action. *But see id.* at 183 (providing false identity to investigators).

**B.      The jurisdictional element in the false statements charges has
         not been substantiated**

The government has failed to prove beyond a reasonable doubt that the statement
made was in a matter within the jurisdiction of a branch of the United States government.
18 U.S.C.A. § 1001.  The underlying matter being investigated substantially must be federal
law.  There has been no suggestion that this was an investigation of a federal offense.  The
misspending of money is not a federal offense and cannot be used as a basis for fraud.  Like
*Countrywide Homes* established, such evidence cannot go to any element of fraud.

On cross examination, Agent Klimczak disavowed that his investigation had anything
to do with the Internal Revenue Code, and affirmed that the investigation was solely
conceptualized as pursuing fraud.  Therefore, there is no room for speculation that he also
had in mind an income tax investigation of Mr. Jabar or Ms. Bowers.

A statement is not a federal offense merely because it was given to a federal agent.
The government has failed to prove that the underlying matter was in fact a federal matter.

**C.      The evidence of intent to deceive is missing**

Based on Agent Klimczak's testimony about the manner in which Ms. Bowers was
questioned, and the explanations she gave at the time of the interview, no rational juror could
conclude, beyond a reasonable doubt, that Ms. Bowers intended to deceive Agent Klimczak
at any point during the interview.

# Subsequent "misapplication" of funds
# cannot substitute for proof of specific
# intent

Even if somehow the accused were held to have made the representations alleged in
the indictment, and even if taken as materially false, government makes clear in its pretrial
memorandum that there is no direct evidence that there was any fraudulent purpose in the

application for funds to build a radio station.   What the government proposes as its circumstantial proof of the "scheme" is (1) what it calls evidence of Mr. Jabar's "financial difficulties," and "deep financial trouble" [Dkt. 277, p. 4,16] prior to seeking the U.N. grant; (2) the "misspending" of funds after $350,000 was received; and (3) other implied improprieties related to UN "guidelines" or IRS or similar rules related to operation of not-for-profits The indictment alleges nothing criminal about the overt acts involving the alleged use of the grant funds, apart from the funds supposedly being used to "to reap profits for themselves" and "for their personal enrichment."  Of course none of the "diversion" of funds alleged would actually constitute a *federal* crime even if it was a form of "theft."

The primary leg of the government's circumstantial fraud argument is that one could infer fraudulent intent, in its three aspects, from any misuse of the funds when they arrived months after the application for the grant of funds.   There is a logical chain of inferences that are missing if we are attempting to equate mere misuse of  money with specific intent to commit a crime in order to get money. Even if the government was able to prove conscious wrongdoing in the "misspending" it has alleged, it has not even intimated any kind of evidence which would give even nearly equal circumstantial support,"  *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002); *Cosby v. Jones,* 682 F.2d 1373, 1383 (11th Cir.1982), to an inference that the application for UN funds was fraudulent.  In almost any case there is at least equal inference that any "taking" was opportunistic at the time.  The government has not suggested how any conclusion as to a fraudulent intent at the outset could be reached "without resorting to speculation and surmise." *United States v. Stewart*, 305 F.Supp.2d 368, 370 (S.D.N.Y. 2004); *United States v. Cassese*, 290 F. Supp. 2d 443, 448 (S.D.N.Y. 2003).

Of course the government has tried in many cases to equate breaches of agreements with fraud – this would dramatically expand areas of possible expansion of federal law enforcement.  The courts have not allowed the government to succeed.  The Second Circuit has very recently conclusively shut down any argument that breaches of an agreement may

14

be argued as a basis to  find of fraud, even in a civil context.

> [W]here allegedly fraudulent misrepresentations are promises made in a contract, a party claiming fraud must prove fraudulent intent at the time of contract execution; evidence of a subsequent, willful breach cannot sustain the claim. Far from being "arcane limitations," *Countrywide I*, 961 F.Supp.2d at 607, these principles fall squarely within the core meaning of common-law fraud that neither the federal statutes nor *Durland* disrupted. *See Neder*, 527 U.S. at 24 ("[Durland] did not hold, as the Government argues, that the [mail fraud] statute encompasses more than common-law fraud.").

*U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, --- F.3d ----, 2016 WL 2956743

Slip. Op. p. 14 (May 23, 2016) (Reversing judgment by Judge Rakoff, with $1.2 billion

penalties, and dismissing complaint).

> It is emphatically the case—and has been for more than a century—that a representation is fraudulent only if made with the contemporaneous intent to defraud—i.e., the statement was knowingly or recklessly false and made with the intent to induce harmful reliance.

Slip. Op. p.14.

> Of course, "fraudulent intent is rarely susceptible of direct proof, and must instead be established by legitimate inferences from circumstantial evidence." *United States v. Sullivan,* 406 F.2d 180, 186 (2d Cir. 1969). Nonetheless, where the relevant representation is made within a contract, *the common law rejects any attempt to prove fraud based on inferences arising solely from the breach of a contractual promise*:
>
>> [T]hat proof that a promise was made and that it was not fulfilled is sufficient to prove fraud . . . is not, and has never been, a correct statement of the law.
>
> *Tenzer*, 39 Cal. 3d at 30.

Slip. Op. p. 16. The *Countrywide* opinion goes on at length reiterating this point. See Slip.

Op. p. 16-23.  The discussion makes it very clear that intent to defraud at the outset may not

be inferred from the subsequent breach:

> [a]ccordingly, the common law requires proof—*other than the fact of*

> *breach*—that, at the time a contractual promise was made, the promisor had no intent ever to perform the obligation

Slip Op. p. 17.  I.e., the Court did not say "proof–*in addition to* the fact of the breach."[2]

> In sum, a contractual promise can only support a claim for fraud upon proof of fraudulent intent not to perform the promise at the time of contract execution. Absent such proof, a subsequent breach of that promise—even where willful and intentional—cannot in itself transform the promise into a fraud. Far from being an arcane limitation, the principle of contemporaneous intent is, like materiality, one without which "the common law could not have conceived of 'fraud.'" *Neder*, 527 U.S. at 22.

Slip. Op. p.22.  The decision concludes by specifically cautioning against allowing cases like the instant one:

> In essence, the Government's theory would convert every intentional or willful breach of contract in which the mails or wires were used into criminal fraud, notwithstanding the lack of proof that the promisor intended to deceive the promisee into entering the contractual relationship.

Slip Op. p.21

The obvious problem here is that the government relies almost exclusively on the claim that, after receiving the funds, the defendant's took money for themselves.  This is nothing other than the kind of "breach of agreement" conduct that *Countrywide* rejects as a basis for inferring fraudulent intent in seeking the grant to begin with.  The Court has to be alert to the ways in which the government typically deals with such a difficulty in proving what has been alleged – proving some other "misconduct" that a jury might convict for, or changing the "crime" to something easier to prove.

---

[2] The opinion notes that the government agreed that "fraudulent intent cannot be inferred from a mere breach of contract."  Govt. Brief, p. 44.

# The government should not be allowed
# to shift to a "theft" theory

The government makes clear in its pretrial memorandum that there is no direct evidence that there was any fraudulent purpose in the application for funds to build a radio station.  What the government proposes as its circumstantial proof of the "scheme"  is (1) what it calls evidence of Mr. Jabar's "financial difficulties," and "deep financial trouble" [Dkt. 277, p. 4,16] prior to seeking the U.N. grant; (2) the "misspending" of funds after $350,000 was received; and (3) other implied improprieties related to UN "guidelines" or IRS or similar rules related to operation of not-for-profits.

There are significant legal problems with the admissibility of any of  this evidence, and limitations on the use to which it may be put if admitted. Cognizant of this, the government has increasingly conceptualized the case as one of "theft" rather than "fraud."[3] Given the opportunity, it will no doubt attempt to do the same thing before the jury. The government insinuates, according to its pretrial memorandum, that the evidence of Mr. Jabar's "financial difficulty," constitutes proof of "fraudulent intent" when the grant was sought. [Dkt. 277, p. 10-11, 16, 21].

# "Financial difficulties" may only, and
# only sometimes, be used as evidence of
# "motive" – but not more

The evidence of financial difficulty presented by the government fell far short of proving a motive to steal money.  The government asks the jury to infer that Mr. Jabar's

---

[3] "As the government has stated in the past, the pending charges involve Jabar's credibility and relate to the *theft of United Nations grant money* and lying to a federal agent." Dkt. 329 p. 4, (*emphasis added*); "All the counts are related to a scheme to defraud the United Nations (U.N.) involving the *theft of money* received pursuant to a U.N. grant." Dkt. 260 p. 1; "The pending charges involve Jabar's credibility and relate to the theft of U.N. grant money and lying to a federal agent." Dkt. 320 p. 6.

financial circumstance was so dire at the time he applied for the grant that his motive in obtaining it was fraudulent and nefarious. Of the copious financial testimony elicited by the government, none of that evidence included a financial analysis of Mr. Jabar's net worth.

The government insinuates, according to its pretrial memorandum, that the evidence of Mr. Jabar's "financial difficulty," constitutes proof of "fraudulent intent" when the grant was sought. [Dkt. 277, p. 10-11, 16, 21].  Although the Court denied Mr. Jabar's motion *in limine* to preclude this evidence altogether, the government has never articulated precisely what it might be admissible for in this case.

## A.   Proof of urgent financial distress may be considered as evidence of "motive" <u>where motive is material.</u>

Proof of urgent financial problems may, in some cases, be probative of "motive," if it were an issue. Since almost any one can be considered motivated to obtain money, something more acute is generally required than just showing indebtedness.  *United States v. Mullings*, 364 F.2d 173 (2d Cir. 1966) was a case in which the defendant was charged with theft of property.  Evidence that he used narcotics and that his take-home pay was under $65 per week was offered to show motive. The court there held that though a lack of money may be admissible to prove motive, and to prove identity, this particular evidence was inadmissible because "the chain of inferences" with respect to the defendant's need for funds was "too speculative," *id*. at 175, and was outweighed by the prejudicial effect of the evidence of his narcotics addiction.  *Id*. at 176.

In *United States v. Mitchell*, 172 F.3d 1104 (9th Cir. 1999), the government also sought to use evidence of poverty as proof of motive, and again motive was relevant to the issue of identity of the defendant as the culprit.

> As indicated above, the prosecutor faced some difficulties in proving that Mitchell was the robber. One of the devices she used was to show that Mitchell had motive: he needed the money because he was

poor. This evidence was a major part of the trial.

*Id.* at 1104.   Here in fact a good percentage of the government exhibits and a good percentage of its witnesses seem to be devoted to this idea.

But, as noted in *Mitchell,*

> Poverty as proof of motive has in many cases little tendency to make theft more probable. Lack of money gives a person an interest in having more. But so does desire for money, without poverty. A rich man's greed is as much a motive to steal as a poor man's poverty. Proof of either, without more, is likely to amount to a great deal of unfair prejudice with little probative value.

*Id.* at 1108-09.

## B.   The relevance of motive is not shown

In fact, the government seems deliberately vague about the actual point of its "financial difficulties" evidence.   The government does not attempt to articulate how "motive" to obtain money is material to the case.   It does not propose any jury instruction covering the question.[4]

As we have pointed out, and expressed in our proposed jury instructions [№ 52], usually having a "motive" is related to the identity of the perpetrator of an obvious crime like a bank robbery, as in *Mullings* and *Mitchell* above.   Here the government has not articulated

---

[4] The government's requested instruction 42, is entitled "Using Motive for Intent." The text does not support the title which is taken from a Sand, Seiffert instruction.  As is too common in the Sand, Sieffert book, the title does not correlate with the text. The title groundlessly suggests that evidence of some kind of motive can be substituted for some kind of intent. But the actual instruction proposed only goes so far as to suggest that "the presence or absence of motive is a circumstance which you may consider as bearing on the intent of a defendant." Obviously this is not something tailored to fraud allegations, nor is it cognizant of the cases which rather suggest that motive relates more to issues of identity. The Sand charge is "adapted from" the charge apparently given by the trial judge in the case of *United States v. Cirillo*, 468 F.2d 1233 (1972), a narcotics case, with a citation given to 554 F.2d 54 (2d Cir. 1977).  That decision, on a §2255 petition, has nothing to do with jury instructions or motive.  Nor, for that matter, does the decision on the direct appeal, which involved no question of the propriety of the jury charge.

any question of identity of a perpetrator to a *known crime*. Rather, here the government is using motive as a way to suggest that there *was an offense* at all.  It offers no authority to support this. Here the government's intended proof regarding Jabar is clearly designed to show also that Jabar is financially irresponsible and therefore likely to commit a crime, an attack on his character if there ever was one rather than evidence of the charged crime.

If left to their own, the prosecution here will do what was done in *Mitchell:*

> At a subsequent pretrial conference, after the judge said that "just general testimony that someone is poor would be inappropriate" and asked for clarification of the prosecutor's proffer, the prosecutor said "it would not be our intent [to] introduce evidence that because the defendant is poor, he's likely to commit a crime." But she did.

*Id.*

Indeed, the numerous financial records gathered regarding Jabar's bills, late payments, etc., suggest that the government is intending this character issue.

> The prosecutor did not merely show that Mitchell would be better off if he had a few thousand dollars more. She effectively portrayed him as a feckless man who did not support his wife and children. She showed with the poverty evidence that Mitchell let his wife draw welfare while he went to the basketball court, lived on his parents' bounty at an age where most people do not, and let his family get evicted from their apartment. Jurors' feelings about a man who lives that way have no legitimate bearing on whether he should be convicted of robbing a bank. That a person is feckless and poor, or greedy and rich, without more, has little tendency to establish that the person committed a crime to get more money, and its probative value is substantially outweighed by the danger of unfair prejudice. The district court's discretion was not broad enough to allow admission of the evidence of Mitchell's impecunious financial circumstances.

*Mitchell, supra*, at 1110.

There is actually no question about "motive" in this case, in the sense that Jabar, and Bowers, were clearly motivated to get funds from the U.N. for the radio station, or in the sense that it was they who were seeking the money.  The government needs to be particular

20

about the exact purpose of this testimony so that the Court can focus on its admissibility and what limiting instruction to give.

**C.** **"Motive," no matter how strong or urgent, cannot be substituted for the proof of the specific intent to misrepresent or to cause harm that is required in a case of fraud.**

Without saying so specifically, the government intimates that the evidence of Mr. Jabar's "financial difficulty," can be substituted for proof of "fraudulent intent" when the grant was sought. [Dkt. 277, p. 10-11, 16, 21].  That is what is suggested in the title given to its jury instruction on "motive."  But "motive" to "make money" is not relevant to or probative of intent to defraud  – they are completely different concepts.   There is no precedent we (or apparently the government) can find that financial "difficulties" would be a permissible basis from which to infer specific intent to misrepresent and to defraud.

To the contrary, cases refuse to allow this*, even in a civil context.  Mack Univ. LLC v. Halstead*, No. SA CV 07-0393 DOC, (C.D. Cal. Nov. 14, 2007). ("However, if a desire to make money were the hallmark of an intent to defraud, the Court could assume that any investor acted with scienter in any transaction. After all, the purpose of investment in securities is to make money."  *Russell Publ'g Grp., Ltd. v. Brown Printing Co.*, No. 13 Civ. 5193,  (S.D.N.Y. Feb. 05, 2015) at n. 18. ("The Complaint alleges multiple instances of erroneous billing in Brown's favor, and Brown undoubtedly has a motive to make more money. But these facts alone cannot give rise to a strong inference of Brown's intent to defraud . . . .).  *Pu v. Charles H. Greenthal Management Corp*., 2010 WL 774335 (SDNY 2010). ("Pu's complaint does not adequately plead a RICO claim. . . . Pu's allegations about defendants' motives require even less discussion; they fall well short of supporting an inference that defendants intentionally lied to unit holders, mortgagees, or anyone else to obtain the assessment monies. . . .  *Powers v. British Vita, P.L.C.*, 57 F.3d 176 at 184(2d Cir.1995); *West 79th Street Corp. v. Congregation Kahl Minchas Chinuch*, No. 03 Civ. 8606,

21

2004 WL 2187069 (S.D.N.Y. Sept. 29, 2004), at *8.").

The government offers no authority to support such a chain of inferences in any case, and surely there would be such a case if this had been tried before. Tellingly, the government does not even attempt to frame a jury instruction which would permit the jury to do what the government wants here, substitute a finding of a motive to make money for the various intents necessary to find a "scheme to defraud."[5]

# Conclusion

For the above reasons all the charges must be dismissed pursuant to Rule 29.

Dated:  August 18, 2016

Patrick J. Brown, Esq.
LOSI & GANGI
147 Linwood Avenue
Buffalo, New York 14209
(716) 854-1446
pjbrown@Losi-Gangi.com

Respectfully submitted,
/s/ Mark J. Mahoney

Mark J. Mahoney, Esq.
HARRINGTON & MAHONEY
70 Niagara Street, 3rd Floor
Buffalo, NY   14202-3407
Ph: 716-853-3700
Facs: 716-853-3710
mjm@harringtonmahoney.com

---

[5]  We demonstrate in our proposed jury instructions that there are actually three types of intent needing to be proven: intent to deceive, intent to wrongfully obtain property, and intent to economically  harm the victim.  Obviously none of these can logically be found on the basis of a motive, no matter how strong, to "make money."