United States District Court
Western District of New York

United States of America,

*Plaintiff*

*vs*

Steve Jabar and Deborah Bowers,

*Defendants*

**Defendants' Motion for
Judgment of Acquittal and New Trial
FRCrP 29, 33**

09-Cr-170-V

Dated:  October 28, 2016

Patrick J. Brown, Esq.
LOSI & GANGI
147 Linwood Avenue
Buffalo, New York 14209
(716) 854-1446
pjbrown@Losi-Gangi.com

Mark J. Mahoney
HARRINGTON & MAHONEY
70 Niagara Street, 3rd Floor
Buffalo, NY   14202-3407
Ph: 716-853-3700 (fax)
Facs: 716-853-3710

*(Attorneys for Steve Jabar and Deborah Bowers)*

Contents

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

   Cases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

   Other Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

Notice of Motion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Motion to Dismiss: Count 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

 A.  The claims essential to a valid conviction . . . . . . . . . . . . . . . . . . . . . . . . 2

 B.  The standard for granting a Rule 29 Motion . . . . . . . . . . . . . . . . . . . . . 3

 C.  The government had no evidence of intent to cause economic harm to the UN,
   and never even argued that it did. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

 D.  The internet emailing on which Count 4 was predicated could not have been
   "for the purpose of executing the [ ] scheme and artifice to defraud" as it
   occurred after the completion of any fraud. . . . . . . . . . . . . . . . . . . . . . . 8

 E.  The government failed to prove the "false representation" element. . . . . . . . . 9

   *1.  What the indictment alleges to be the false representations* . . . . . . . . . 10

   *2.  The government's actual theory was very different from the indictment*
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

   *3.  None of the representations in the indictment required segregation of the*
    *grant money.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    Art. VIII, ¶1 "The second and subsequent installments". . . . . . . . . 14

    Art. VIII, ¶2 "utilize the funds . . . in strict accordance with the
    Project Document.". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    Art. IX, ¶10: "keep accurate and up-to-date records and documents
    in respect of all expenditures". . . . . . . . . . . . . . . . . . . . . . . . 15

   *4.  The government has failed to prove that the representations alleged in*
    *the indictment were made by Mr. Jabar* . . . . . . . . . . . . . . . . . . . . . 16

   *5.  Even if Mr. Jabar had read the agreement, and was legally bound by it,*
    *there is no evidence that his last minute acquiescence to changes*
    *insisted on by the UN was in furtherance of the charged scheme.* . 18

 F.  The government failed to prove a contemporaneous intent to defraud. . . . . . 18

   *1.  Subsequent "misapplication" of funds cannot substitute for proof of*
    *specific intent to defraud.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

   *2.  The government's insistence that the payments constituted "theft" is*

*inconsistent with a claim of "intent to defraud"*. . . . . . . . . . . . . . [23](#)

    3. *The "Financial difficulties" evidence was not legally sufficient to make up for the lack of evidence of intent to defraud.*. . . . . . . . . . . . . . . . . [25](#)

      "Motive," no matter how strong or urgent, cannot be substituted  for the proof of the specific intent to misrepresent or to cause harm that is required in a case of fraud. . . . . . . . . . . . . . . . [27](#)

G.  The government was allowed to pursue shifting theories of criminality. . . . . [28](#)

    1. *The government focused on different "false representations" than alleged in the indictment.* .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [29](#)

    2. *Shifting to different theories of criminality was a fatal variance*. . . . . . [31](#)

H.  The government never even attempted to disprove the good faith defense.. . [33](#)

Motion to Dismiss: Count 1 – Where the alleged conspiracy is completed, acquittal or dismissal of the substantive counts requires dismissal of the conspiracy. . . . . . . . [34](#)

Motion to Dismiss:  §1001 Charges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [35](#)

A.  The evidence of knowledge and intent to deceive is missing. . . . . . . . . . . . . [36](#)

    1. *The Jabar interview*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [36](#)

    2. *The Bowers interview*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [38](#)

B.  The materiality of the false statement charges has not been substantiated. . . [40](#)

C.  The jurisdictional element in the false statements charges has not been substantiated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [42](#)

Motion for a New Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [43](#)

A.  Improper admission and use of evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . [43](#)

    1. *The unqualified admission of evidence of "Financial difficulties"*. . . . [43](#)

    2. *The improper admission and use of purported violation of tax regulations*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [45](#)

    3. *The improper admission and use of Ex. 30B*. . . . . . . . . . . . . . . . . . . . [46](#)

    4. *Improper admission and use of claims about inadequate  corporate governance at OKI and claims about representations about board membership.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [47](#)

B.  Use of false testimony by the government. . . . . . . . . . . . . . . . . . . . . . . . . . . [47](#)

C.  Inflammatory and improper argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [54](#)

D.  Deprivation of the Right to Present a Defense. . . . . . . . . . . . . . . . . . . . . . . [54](#)

    1. *Exclusion of evidence and disclosure of the improper motivation of the government*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [55](#)

    2. *Limiting cross examination and evidence of Agent Klimczak, and disclosure, on bias*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [55](#)

E.  Jury Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [56](#)

F.  The §1001 charges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

# Table of Authorities

## Cases

*United States v. Silverman*, 430 F.2d 106 (2d Cir. 1970). . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Connors v. Fawn Mining Corp.*, 30 F.3d 483 (3d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . 17

*Cosby v. Jones,* 682 F.2d 1373 (11th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Epstein v. United States*, 174 F.2d 754 (6th Cir. 1949). . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Jackson v. Virginia*, 443 U.S. 307 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Mack Univ. LLC v. Halstead*, No. SA CV 07-0393 DOC, (C.D. Cal. Nov. 14, 2007). . . 26

*O'Kinsky v. Perone*, CIVIL ACTION NO. 10-6075., 2012 BL 182032 (E.D. Pa. Apr. 20, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Powers v. British Vita, P.L.C.*, 57 F.3d 176 (2d Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . 26

*Pu v. Charles H. Greenthal Management Corp.*, 2010 WL 774335 (S.D.N.Y. 2010). . . 26

*Russell Publ'g Grp., Ltd. v. Brown Printing Co.*, No. 13 Civ. 5193 (S.D.N.Y. Feb. 05, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Stirone v. United States*, 361 U.S. 212 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, --- F.3d ----, 2016 WL 2956743 (May 23, 2016).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Adekanbi*, 675 F.3d 178 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Ajayi*, 808 F.3d 1113 (7th Cir. 2015).. . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Ansaldi*, 372 F.3d 118 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Autuori*, 212 F.3d 105 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Cassese*, 290 F. Supp. 2d 443 (S.D.N.Y. 2003). . . . . . . . . . . . . . . . . . . 20

*United States v. Cirillo*, 468 F.2d 1233 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Clemente*, 22 F.3d 477 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Crowley*, 79 F. Supp. 2d 138 (E.D.N.Y. 1999). . . . . . . . . . . . . . . . . . . . 32

*United States v. Eaton*, 501 F.2d 77 (5th Cir. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Gaudin*, 515 U.S. 506 (1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Glenn*, 312 F.3d 58 (2d Cir. 2002).. . . . . . . . . . . . . . . . . . . . . . . . . . 3, 20

*United States v. Guevara*, 277 F.3d 111 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Lander*, 668 F.3d 1289 (11th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. McKeon*, 738 F.2d 26 (2d Cir. 1984).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Mitchell*, 172 F.3d 1104 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Mullings*, 364 F.2d 173 (2d Cir. 1966), 364 F.2d 17. . . . . . . . . . . . . . . 27

*United States v. Ratliff-White*, 493 F.3d 812 (7th Cir. 2007).. . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Reeder*, 170 F.3d 93 (1st Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Robinson*, 430 F.3d 537 (2d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Santos*, 553 U.S. 507 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Stewart*, 305 F.Supp.2d 368 (S.D.N.Y. 2004). . . . . . . . . . . . . . . . . . . . . 20

*United States v. Stewart*, 433 F.3d 273 (2d Cir.2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Vebeliunas*, 76 F.3d 1283 (2d Cir. 1996).. . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Walsh*, 195 F. 3d 37 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . [32](#)

*Virgin Islands v. Aquino*, 378 F.2d 540 (3d Cir. 1967). . . . . . . . . . . . . . . . . . . . . . . . . [32](#)

*West 79th Street Corp. v. Congregation Kahl Minchas Chinuch*, 2004 WL 2187069
(S.D.N.Y. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [26](#)

## Other Authorities

41 Am. Jur. 2d Indictments and Informations § 261. . . . . . . . . . . . . . . . . . . . . . . . . . [32](#)

# Notice of Motion

The defendants  Steve Jabar and Deborah Bowers hereby move for a judgment of acquittal on all counts of conviction, pursuant to Rule 29, or, in the alternative, a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure, and on all the constitutional principles relied upon herein and their prior motions for relief.

# Introduction

The Court has reserved decision on our motions for a judgment of acquittal, made at the conclusion of the government's case and again at the conclusion of all the proof. This motion reiterates the prior motions and amplifies them with additional obervations based on the completed trial.  We also now add a motion for a new trial under Rule 33.

 The fraud convictions cannot be allowed to stand.  At every juncture of analysis the government's proof failed, as is evident from the final desperate insistence by the government, contrary to the jury instructions and *Countrywide Home*, that the alleged breach of contract conduct established the required proof of intent to defraud.  Of course this seems to have had its effect on a jury whose verdict radiates confusion.

Factually, any reasonable juror must have had a doubt about the false statement allegations.  In any event, a new trial would be warranted on these charges given the immense "spillover effect" of the evidence admitted on the fraud counts, and the far ranging questioning by the government designed to suggest lack of candor on the part of the defendants.

If not dismissed, we also seek a new trial on the fraud and conspiracy charges, on several grounds related to the government's excessive imploring to the jury in disregard of the law, the inadequacy of the jury instructions to inform the jury of the actual elements of fraud, the introduction of false testimony by the government that the U.S. could not have investigated the "good faith" allegations, and the exclusion of evidence,

1

that contrary to that testimony, an FBI agent had conducted an investigation in Baghdad in just the weeks before the trial, and more.

# Motion to Dismiss: Count 4

We move for dismissal of the wire fraud counts of conviction pursuant to Rule 29. The essential claim in the fraud counts is that the defendants made "representations to use all of the UNIFEM grant money to establish and maintain 'Voice of Women Radio,'" which was considered false because, contrary to such representations, "the defendants diverted a substantial amount of that money for their own use and private financial gain." This representation  is expressly alleged to be contained in the agreement with the U.N. Indictment ¶¶7-11.  When this claim failed, the government constructed a new claim that the claimed "diversions" were wrong, not because of the agreement, as alleged in the indictment, or any rule of law, but because "common sense" an the opinion of many witnesses (except the accountant who knew better) apparently dictates that grant funds cannot be commingled with an organization's accounts, and using any part of such funds, regardless of any offsetting expenditures or obligations, is therefore "theft" from, well, we are not told, but from *someone*.

## A.  The claims essential to a valid conviction

As points applying to both defendants generally, the government proved none of the following, each of which, on its own,  would be essential to logical determination of guilt:

(i)     that there was intent to cause economic harm to the UN (*i.e.* that  the defendants intended to spend less on the radio station than provided in the grant);

(ii)    that the actual jurisdictional wiring was "for the purpose of executing the above scheme and artifice to defraud";

(iii)   that Jabar ever read the December 13 UNIFEM agreement, or otherwise

2

was aware  of and responsible for any "representations" by the grantee therein;

(iv)    that the UNIFEM agreement contained a representation that the grant funds needed to be segregated and could not be commingled in OKI's general accounts;

(v)    that, at the time of seeking the UN grant, the defendants intended to deceive UNIFEM to grant the money to use for their  "private financial gain";

(vi)    that the defendants did not act in good faith in believing that Jabar's contributions to the radios station exceeded and offset any "diversion" of funds.

None of these was proven.  Some are ruled out as a matter of law, and others because of the complete lack of evidence. The verdict on the one fraud count is explained only by the government's having shifted to different theories of criminality than alleged in the indictment, and the jury's very evident misunderstanding of the fraud instructions as a whole.

## B.  The standard for granting a Rule 29 Motion

A motion for a judgment of acquittal must be granted if, after viewing all of the evidence in the light most favorable to the prosecution, no rational trier of fact could find that the required elements of each offense were proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This doesn't mean that the court only looks at the *evidence* favorable to the government.  All the evidence must be reviewed, but with close calls regarding credibility and weight being resolved in favor of the government. Although the Government is not required to negate every theory of innocence, *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000), equal or nearly equal levels of circumstantial evidence supporting theories of guilt and of innocence cannot support a conviction as the jury must then have contemplated a reasonable doubt. See *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir.2002).  The Court must credit defense evidence which the jury had no rational basis to disbelieve. *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.,* 15-496-cv(L), 15-499-cv(Con) (2nd Cir.

2016) at n. 3, (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149–51 (2000) ("That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached. . . .'")).

Here, on each count of conviction, any rational juror must have had a reasonable doubt about the guilt of Steve Jabar and Deborah Bowers.

## C.  The government had no evidence of intent to cause economic harm to the UN, and never even argued that it did

Intent to cause economic harm to the UN is an essential element in this case. *United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003). The Court so instructed the jury.

The government has not proven, or endeavored to prove – it has not even argued – that the UN got less than what it was promised (despite reneging on its part of the deal to the extent of $150,000).  More important, the government has not argued or shown that the defendants *intended* to cause "economic harm" to UNIFEM or the UN.  As the Court put it, Did the defendants intent to spend only $499,000 on the radio station?  We squarely raised this issue in two prior iterations of this motion, and the government never addressed it, despite promising to submit something in writing in response to the motion. We then squarely raised this issue in the defense closing:

> Part of the fraud charge requires intent to cause . . . economic harm to the U.N. . . . [T]he issue can only be not giving [ ]  the U.N. what it bargained for, what it was promised, the radio station that they were promised.  And they got that, and much of more.

[Mahoney closing, p.79]  The government never addressed this element in its closing or rebuttal.  What could it say?

The government even admitted that the UN got the radio station for which it contracted with OKI. It admitted this in its opening statement.  The radio station that was contemplated in the Institutional Contract of November 25, 2004 and in the other

4

documents drafted by the UN in December, was actually built. None of the UN witnesses suggested otherwise.  While the expenditures may have deviated from the budget, they did not do so in a way which undercut the radio station, but rather enhanced it. And this was only addressed by the defense, not the prosecution.[1] There was not a single bit of evidence that any of the components of the project specified in the budget had not been purchased and implemented, or the equivalent.

The expenditures on the radio station exceeded what the UN gave to OKI according to the quarterly report filed with  UNIFEM [Gx 12E], which the government did not attempt to prove was false.[2]  And this report was corroborated by the receipts from the first quarter which were provided to UNIFEM by the radio station, which shows $362,918 having been expended at that time, DX37A, which in turn was supported by our accountant's analysis of the available evidence of expenditures showing expenditures of $357,361.49 by March, 2005 and then, conservatively, $625,203.12 through the end of 2006. [DX78.]  That analysis, in turn, was corroborated by the certified annual financial report, DX46A, which showed expenditures in excess of what our accountant deduced,

---

[1]  Bushra Jamil went through the significant differences between the expected expenditures and the actual.  For example, a less expensive transmitter was used, and a needed generator was added. The government never addressed this.

[2]  While the report was called "fraudulent" by the government, in fact the basis for that assertion was proven false by the government's own witness and exhibits.   The government claimed that it was false because it failed to show the "personal expenditures."  But the UNIFEM agreement and the government witnesses, in addition to Bushra Jamil, testified that the purpose of the quarterly report was to demonstrate that the budgeted expenditures were being made on the radio station.  The government asked the witnesses if the "personal" expenditures were on the quarterly report, but never asked if they were *supposed* to be reflected there.  Bushra Jamil testified that the quarterly report did what it was supposed to do by showing what had been expended on the radio station, and not providing an audit trail.  So the government deliberately forewent trying to prove that the quarterly report was genuinely deceptive, and was content with mere insinuations.

over $700,000.[3]  With our accountant's analysis corroborated by these two unchallenged reports, the best that the government could do to dispute it was to point out two errors in the math in our accountant's report, errors which *understated* the estimate of contributions by around $9000.  But the government did nothing to challenge the total expenditures reflected in the collection of original receipts or the certified financial statement for 2005. So the jury was bound to accept the evidence that the expenditures were significantly in excess of the amount of the UN grant, even in excess of what the UN had originally promised to contribute, and, as the accounting demonstrated, the "personal expenditures" never exceeded the actual contributions and expenditures toward the radio station.

The government never sought to prove that the UN did not get more in the radio station expenditures than what it had granted, taking instead the deliberately myopic view that it could focusing only on the "theft of funds" from OKI as its theory, and disregard the possibility that the radio expenditures were coming from other offsetting resources.

> Q. And that is really the basis for your investigation and presentation to the grand jury?
> A. Well, they definitely got the benefit of the money, that's what I was following, yes.
> Q. On that end. So the money was diverted there, but -- and that's all you were looking at?
> A. That's what I was looking at, yes.
> MR. MAHONEY: That's all I have.

[Mahoney Cross of Agent Klimczak, p.  237].

So, the government's focus on the quarterly report was not on how much was expended, but only on its "failure" to list the "misspending" items.  Thus was very self delusional, because even though the UN witnesses testified that the quarterly report is

---

[3]  It was the testimony of our accuntant that the certified financial statement for 2005, when dinars were convereted to dollares, was over $700,000.

only for "expenditures" made on the project, and not to "trace the money," as if in an audit. Of course, "stealing" money from OKI would have no harmful effect on the UN, unless it resulted in less than a $350,000 radios station. So, the end result is that the government not only had no evidence of the requisite intent to economically harm the UN, it never even *argued to the jury* that it had such evidence.

While there were vague programming complaints and unspecified claims about questionable expenditures or the failure to provide receipts in connection with the UN's complaints about the quarterly report, no effort was made to translate these complaints about the *accounting* for the radio station project into any proof of the kind of economic harm necessary under §1343. In fact the defense begged this very question in closing, and the government had no answer:

> The question would be, would their failure to keep records be the economic harm that the statute requires them to intend -- intend economic harm?
> But that's really not what the indictment finally concludes from this, [as the meaning] of these provisions, because . . . the indictment reaffirms the same thing that Agent Klimczak originally said or thought, the same thing the government is saying today, which is somewhere there's a requirement that U.N. dollars can't be spent on anything else.

[Mahoney closing, p. 63]. So, even when directly challenged like this to articulate some kind of economic harm to the UN, or *intent to harm* the UN, the government was silent. Rather, the overwhelming and unchallenged evidence with respect to the radio station by both defendants revealed unrestrained dedication to create the radio station they had envisioned, even after UNIFEM reneged on its agreement, and even to the extent of incurring huge additional obligations (in contrast to "personal gain).

The closest the government came to pretending to address the issue was in positing that the private expenditures at issue caused the "harm," which was not cured by "paying it back." [Govt. Closing, p. 19-20;29]. This was part of the government's "stealing"

theory, which is completely fallacious in this context because the money belonged to OKI, not the UN, once it was distributed.  The government knew this, so in addressing the jury, it simply accused the defendants of "theft," being careful not to say *from whom*.

## D.  The internet emailing on which Count 4 was predicated could not have been "for the purpose of executing the [ ] scheme and artifice to defraud" as it occurred after the completion of any fraud

If the jury thought there was a scheme to defraud as the indictment conceptualizes, there was no rational basis to convict on just one count.  It is most plausible that the jury, in a compromise, seized upon Count 4 in the confused belief that, while there was no proof that there was anything fraudulent in the October 24, 2004 email containing OKI's account information (Count 2) or the December 15, 2004, transfer of the $350,000 to OKI's account (Count 3), there *was* something the government claimed to be fraudulent about the May 28, 2005 quarterly report that was the jurisdictional "wiring" for Count 4.

The problem with this is too obvious: the "scheme to defraud" was "complete" well before this. The government The government first articulated this three years before the trial in its Response in Opposition To Defendants' Motion in Limine, [Dkt. 148 p.10.] ("Thus, the wire fraud criminal activity alleged in the Indictment was completed upon receipt of the UNIFEM funds.").  The government took this position in specific response to our motion to dismiss the money laundering counts, which could not survive if the financial transactions resulting in the alleged  payments to Jabar and Bowers were considered as part of the fraudulent conduct.  *See, United States v. Santos*, 553 U.S. 507 (2008).

The government is, of course, bound by these judicial admissions.  *United States v. McKeon*, 738 F.2d 26, 27-34 (2d Cir. 1984);  *Stirone v. United States*, 361 U.S. 212, 216-17 (1960), as we noted repeatedly, without dispute.  [Dkts. 121; 148 p.10; 277 p. 21; 308 p. 9; 353 p. 42 n.3; Dkt. 353 p. 42].

8

But we have eclipsed this, because this fact was relied on repeatedly by the Court during the trial, with the acceptance by the government. So that is settled now and has been for three years.

As a consequence, the emailing of the quarterly report, on May 28, 2005, could not have been "for the purpose of executing the above scheme and artifice to defraud and attempting so to do," as alleged in the indictment. The alleged scheme was completed 5 months earlier.

The government could have sought to have that count dismissed it order to avoid the risk that the jury would find only on that one fraud count, but it did not. It wanted to hedge and maximize the conviction possibilities. In doing so it took a risk that an unwarranted verdict on Count 4 might be the only fraud verdict in its favor. *United States v. Powell*, 105 S.Ct. 471 (1983) recognized that, in such a case as this, the jurors must have disregarded the instructions at some point in their deliberations, but "it is unclear whose ox has been gored" thereby. Here it cuts both ways. In a compromise the defendants lost; but, in the choice of count for a conviction, the government lost because they picked one that legally cannot stick.

## E. The government failed to prove the "false representation" element

Fraud is not merely a larceny *accompanied* by false statements, but an unlawful taking accomplished *by means of false statements*. False representations are the core of criminality in a fraud charge. The indictment is very specific about the "representations" at issue in the fraud allegations. And yet, the government never proved the meaning, or the falseness of the representations, or Mr. Jabar's (or Ms. Bowers') responsibility for those alleged representations. Indeed, despite a detailed challenge to the meaning of the "representations," and whether they could even be attributed to Mr. Jabar (and Ms. Bowers), and to whether they were "false" in any way [*see* Mahoney summation p. 63-

69], the government never even argued to the jury that it had established this element.[4]

## 1. What the indictment alleges to be the false representations

The indictment refers to the "Standard Project Cooperation Agreement" [Ex. 12B] as containing the "representations" at issue, (Indictment ¶¶8-10), specifically as follows:

| | |
|---|---|
| Art. VIII, ¶1 | The second and subsequent installments will be advanced to [OKI] quarterly every three months, when a financial report and other agreed-upon documentation, for the activities completed have been submitted to and accepted by UNIFEM as showing satisfactory management and use of UNIFEM resources. |
| Art. VIII, ¶2 | to utilize the funds and any supplies and equipment provided by UNIFEM in strict accordance with the Project Document. [OKI] will report on the first installment by (31st March 2005) in order to ensure timely disbursement of second installment. |

---

[4] The sole reference to the UNIFEM agreement provisions in the government summations was at p. 22 of the closing, which referred to two of the implicated provisions, but not their meaning, or how they were attributable to Mr. Jabar, or how they were false. Indeed, the argument is explicitly made that the *agreement does not matter*, only "common sense":

> Now, if you go by Bushra Jamil's version, she says the standard cooperation agreement was an amendment to the institutional contract.
> Even if it was, they would still be bound as of the date that they signed the cooperation agreement -- which was December 12th and December 13th by UNIFEM -- and the terms in that cooperation agreement which says you are going to have to accurately provide records and documents of all expenditures that are incurred with UNIFEM funds and to ensure that all expenditures are in conformity with the provisions of the project work planned and the project budget.
> But either way, *whatever agreement is in place*, common sense says you can't take the money and use it for whatever you want when you get a grant.

At four points, the AUSA referred to the phrase, "a scheme to defraud or obtain money by means of false or fraudulent pretenses, representations or promises," [*id.* pp. 5, 10, 11, 25]. But there was no suggestion as to what these representations even were.

Art. IX, ¶10          keep accurate and up-to-date records and documents in respect of
                      all expenditures incurred with the funds made available by
                      UNIFEM to ensure that all expenditures are in conformity with the
                      provisions of the Project Work Plan and project Budgets.

The government repeatedly identified these as the "representations." [Dkts. #65 p.4; #138
p.16; #139 p.2; #141 p.1; # 277 p. 13; #351 p.2-3].

The indictment insinuates that from these provisions can be distilled a particular
representation: that the funds granted by the UN "would be used . . . for the purpose of
establishing and running a radio station":

> the defendants, having *obtained grant money* from UNIFEM *by*:
> (a) representing that *all money would be acquired and used by the*
> *not-for-profit corporation OKI for the purpose of establishing and*
> *running a radio station* in the country of Iraq; and (b) agreeing to
> the terms and conditions set forth in the UNIFEM Agreement.

Indictment ¶ 14.

## 2. *The government's actual theory was very different from the* *indictment*

The actual assumption underlying the government investigation, and the actual
theory of the government at trial, was something quite different from this general notion
in the indictment that the grant would be "used for the radio station."  Even though Agent
Klimczak was aware from August of 2006 that funds from others were also available to
OKI and used to start the radio station, he, and later the USAO, adopted and clung to the
idea that there was *something* which prevented OKI from commingling these funds from
UNIFEM with whatever other resources it had, and required OKI to segregate the funds
into an account dedicated to radio expenditures.  Under this theory, use of any of the
actual dollars from the grant for any other purpose was improper, making any such
"diversion" contrary to the agreement with the UN, or so Agent Klimczak believed
(apparently before he even saw any agreement).  This the government repeatedly

11

described as  a "theft," though it was careful never to take a position on *from whom*.
Clearly the funds belonged to OKI at the time of these transactions. But the government,
in its scattershot approach to criminality, hoped that the jury would think that the UN was
the victim of any "theft."

The government never attempted to prove that this "theft" theory derived from any
of the representations alleged in the indictment.  Indeed, at the end it disavowed the
UNIFEM agreement as even being relevant.  Responding to the defense argument that
nothing in the UNIFEM agreement required segregation of the funds into a dedicated
account (though mischaracterizing it), the government said:

> That's not what the government is saying. . . . What the government
> is arguing is that you can't take UNIFEM money and spend it any
> way you want.

[Rebuttal, p. 47-48].  But the source for this, the government's actual trial theory, was a
"man on the street" "common sense"  argument not based on the indictment, the
UNIFEM agreement or, for that matter, the law.[5]  So, what followed was reminding the
jury of the several witnesses, witnesses who had no particular qualifications to answer the
real question, who were asked whether a charitable organization, or a church, or a
minister, "could" use grant money or even donations for "personal" expenses.  See Govt.
Rebuttal at p. 50.  These questions were not geared toward to the real question the
government's case depended on: is an organization in receipt of a grant – without some
express agreement otherwise, or some fiduciary duty to hold funds in escrow for a
dedicated purpose – somehow barred from commingling the grant funds or reimbursing

---

[5]  "But either way, *whatever agreement is in place*, **common sense** says you can't take the money and use it for whatever you want when you get a grant. **Common sense** tells you that. You can't pay your own loans and say it's okay." [Closing, p. 20] "Even Mike Bowers said that, Debbie Bowers' husband. A minister that came in here. He said you can't take money from the collection plate even if you intend to pay it back later. It's **common sense**" [*Id.* p. 29]; "Just because Mr. Mahoney and Mr. Brown tell you it's okay doesn't make it so. The defense argument defies logic." [Rebuttal p. 49]

itself for expenditures on the project made from other sources, or advancing the money for other purposes in expectation of offsetting contributions?

When the government asked the defense accountant about it, it got the correct answer: grants, even for special purposes – unless otherwise specified – are simply one of the additions to the general ledger, netted against the other obligations to and receivables from other sources.

The government was content to show that it was not the *intent* of the two UN officials to have its funds used for "personal expenses." In closing the government also relied on what the intentions of the UN were.[6]  It relied on the idea that "common sense," not any legal rule, not any false representations, was what made the "personal payments" "theft."  It never sought an instruction on the existence of such a rule as a matter of law. There is no such rule of law.  As the Court observed, "money is fungible," unless there is some controlling rule or agreement otherwise.  Oblivious, the government plowed ahead.

Consistent with this, the government repeatedly pounded the jury with the idea that the various payments were "stealing," again without ever addressing the question, "from whom?" [7]

What the government has clearly done, in light of its inability to prove the meaning

---

[6]  See Govt. Closing, p. 10 "intended use"; p. 19, "UNIFEM didn't give Steve Jabar and Debbie Bowers grant money to use any way they wanted. UNIFEM did not give Steve Jabar and Debbie Bowers money to use to repay loans;" p. 31 "you have to use the money for its intended use;" Rebuttal, p. 49, "would the U.N. have awarded this grant . . . if they knew their funds were going to be used for personal use;"

[7]  "But no matter what good deeds he does, that's not a license to **steal** money." [Closing, p. 19]; "you still can't **steal** money," [*Id.* p. 21]; "this is an ongoing time frame that they're **stealing** money," [*Id.* p. 29]; "the government is not saying that they intended to **steal** the 350,000. Absolutely not. It's like saying that a bank teller is going to steal the entire drawer that they're working on at the bank that day. That's ridiculous. They're going to get caught. That would be stupid. You **take a little at a time** and maybe nobody will notice. Maybe UNIFEM won't look closely enough," [Rebuttal, p. 41];

of the representations in the incitement or the defendants' responsibility for them (based on signing only a signature page) as required by the statute and the indictment, is to simply shift to a theory of larceny, which it could pass off as "fraud" by chanting "false and fraudulent pretenses" at the mention of each "theft." This is exactly what we said the government was doing in this case, beginning in our original response to the government's first trial memorandum.

### 3.   None of the representations in the indictment required segregation of the grant money

It is clear that none of the representations in the UNIFEM agreement that were recited in the indictment support the claim that OKI was not permitted to commingle the UNIFEM grant money with any other assets, to be treated as fungible money. Correlatively, nothing in these provisions required OKI to preserve these funds in a dedicated account to be used solely for the establishment of the radio station, or barred OKI or Debbie Bowers and Steve Jabar from receiving reimbursement for expenditures toward the radio station.  The government never attempted to prove otherwise, and did not evan argue to the contrary.

**Art. VIII, ¶1 "The second and subsequent installments"**

The first provision recited in the indictment is not a "representation" by OKI or Jabar at all, but a condition imposed by UNIFEM on granting funds beyond the initial $350,000.  Its conditioning later installments on providing "a financial report" "for the activities completed," which is "accepted by UNIFEM as showing satisfactory management and use of UNIFEM resources," certainly does not restrict the commingling of funds, or preclude the use of OKI funds or resources from a different source being used ahead of grant funds.

14

### Art. VIII, ¶2 "utilize the funds . . . in strict accordance
### with the Project Document."

This provision, especially its "strict accordance" language, seems the most likely source of any restriction on how the grant funds might be held.  And yet, as we know, the government never produced the "Project Document."  Moreover, like the previous provision, this "representation" relates to the later installments, not the $350,000 whose delivery was conditioned only on signing.

### Art. IX, ¶10: "keep accurate and up-to-date records and
### documents in respect of all expenditures"

As the UN witnesses and Bushra Jamil testified, the reference to "expenditures" with respect to the quarterly report was to "expenditures" on the radio project.  The quarterly report was not to be an audit.  This provision makes no reference to how the funds must be held, or that they could not be commingled with other resources of used to offset other expenditures on the radio made from other sources.  If the stated purpose of this records requirement is "to ensure that all expenditures are in conformity with the provisions of the Project Work Plan and project Budgets," we cannot tell because neither of these documents was produced.

This representation also relates to the later installments, not the $350,000 whose delivery was conditioned only on signing.

We remind the Court of the unrebutted testimony of Bushra Jamil, corroborated by several contemporaneous emails and letters, to the effect that UNIFEM was well aware of, and actually encouraged OKI to use other available resources to get the project going ahead of the time it would take to have the grant issued, and to arrange some means to get the money to Baghdad.  This would make absolutely no sense if an agency was unable to front resources of its own on the project at the project location.

15

### *4. The government has failed to prove that the representations alleged in the indictment were made by Mr. Jabar*

The evidence establishes that there was an Institutional Contract executed by the UNIFEM Field Office Director and Mr. Jabar, that latter signing on November 25, 2004. [EX207C.]  That agreement, as testified to by both U.N. witnesses Mr. Guha and Ms. Sandler, called for the distribution of $350,000 upon signing that agreement and a balance of $150,000 upon delivery of the equipment for the radio station.  The UN does not consider the agreement binding on it, since it had not been approved by the UNIFEM director.  Nevertheless, Mr. Guha agreed with the obvious fact that the agreement expressed the intentions of Mr. Jabar and the Field Office at the time.

That institutional contract, which Mr. Guha referred to as a "procurement" type agreement, involves no promises other than to provide the radio station described in the contract.  It contains no promises to the effect the funds obtained from the UN would be used solely as a dedicated fund to pay for the radio station, no promises to keep any kind of records, or to report quarterly or otherwise to the U.N. about anything.

From the UN point of view, this understanding changed when the Institutional Contract was forwarded to UNIFEM headquarters in New York where it was initially thought that such a "procurement" contract would require competitive bidding.  On further review and input from OKI and Bushra Samarai, the UNDP Program Coordinator for Iraq,  and the UNIFEM field office director, the Program Approval Committee recommended the project with the addition of some management protocols and the introduction of financial controls and quarterly payments with respect to the $150,000 balance of the grant.  The $350,000  would be disbursed in the same fashion as the Institutional Contract: upon signing.

However, the revelation by Mr. Guha, the government's very first witness, was that there was no evidence that Mr. Jabar ever saw the terms of the Standard Project

16

Agreement incorporating these new terms, including the terms charged in the indictment as the false representations.  Jabar only signed signature pages that were sent to him by email from Shatha Amin of UNIFEM  in Amman.  There is no evidence that he, or Debbie Bowers, were advised of the changes to be made in the arrangement, which included the provisions recited in the indictment.  Called several days later, the UN witness Sandler had nothing additional to offer.  The funds were disbursed on the following day, December 14, 2004, the day the government agrees that any fraud was "complete."

As a result of this, there is no evidentiary support for the allegation that Mr. Jabar "made" the representations actually charged.  Of course there is even less support for concluding that Deborah Bowers was responsible for these "representations."  Signing a signature page alone, on a "take it or leave it" basis, under time constraints, cannot even be taken as agreement to the new terms introduced by the drafting party, and certainly cannot amount to a fraudulent misrepresentation.  In a civil case seeking to enforce a contract, where the party that does not draft the contract and signs only a signature page or the subsequent written agreement differs from a previous oral one, it is considered "excusable ignorance" and the contract cannot be enforced against the ignorant party.  *See Connors v. Fawn Mining Corp.*, 30 F.3d 483, 490-93 (3d Cir. 1994); *O'Kinsky v. Perone*, CIVIL ACTION NO. 10-6075., 2012 BL 182032 (E.D. Pa. Apr. 20, 2012). The time pressures the defendants were under,  the "take it or leave it" reality of the contract, and the fact that the defendants were provided only with a signature page, establish that the contract, insofar as the terms relevant here, was a contract of adhesion and that the defendant's ignorance of its terms is excusable.

In these circumstances the UN could hardly claim that the terms it subsequently inserted for its benefit were representations made by the grantee to induce the UN to enter into the agreement.

17

This gap in the evidence was squarely presented to the jury. The government slid by the issue in its closing, simply asserting that "they signed the cooperation agreement." [Closing, p. 20]  After this point was made in detail in the defense closing [Mahoney, p. 66], the government had no reply.

### 5.   Even if Mr. Jabar had read the agreement, and was legally bound by it, there is no evidence that his last minute acquiescence to changes insisted on by the UN was in furtherance of the charged scheme

Mr. Guha testified that the added provisions regarding keeping records and sending quarterly reports only related to obtaining the $150,000 installment following the initial payment of $350,000.  The initial payment of $350,000 was automatic upon signature, and merely replicated the earlier Institutional Contract, which was a simple procurement contract requiring  OKI to establish the radio station, with no provisions suggesting that the funds had to be the dedicated source of purchasing the equipment, etc. The  $350,000 was not conditioned upon the financial reporting to which the government has drawn attention. If any fraud did occur, if there was any attempt to dupe the UN by creating false financial reports, it could only have related to the remaining $150,000, but the government has not alleged that.  That would be a completely separate scheme than alleged in the indictment.

## F.  The government failed to prove a contemporaneous intent to defraud.

Another of the major breaks in the chain of necessary proof in this case is that the government had no evidence from which it could logically infer that Mr. Jabar, or certainly Ms. Bowers, hatched the Voice of Women radio project with the intention of skimming off funds for "personal gain" – the preposterousness of which does not diminish.   The government could hardly dispute that Mr. Jabar's actions – looking at the whole picture, not just the several payments the government myopically focused on – would only put him into greater debt.  As was clear from the testimony of Agent

Klimczak, he never actually got around to getting any evidence that the reimbursement she took (around $7300) was not for expenditures Ms. Bowers made toward the radio project (such as the cost of her exploratory trip to the Mideast the year before that was testified to by her husband and Mr. Jabar's former spouse). [Mahoney Cross of Klimczak p. 226-227]

### 1. Subsequent "misapplication" of funds cannot substitute for proof of specific intent to defraud

Even if somehow the accused were held to representations alleged in the indictment, and even if these representations are taken as materially false, the government makes clear in its pretrial memorandum that there is no direct evidence that there was any fraudulent purpose in the application for funds to build a radio station. What the government proposes as its circumstantial proof of the "scheme" is (1) what it calls evidence of Mr. Jabar's "financial difficulties," and "deep financial trouble" [Dkt. 277, p. 4,16] prior to seeking the U.N. grant; (2) the "misspending" of funds after $350,000 was received; and (3) other implied improprieties related to UN "guidelines" or IRS or similar rules related to operation of not-for-profits. The indictment alleges nothing criminal about the overt acts involving the alleged use of the grant funds, apart from the funds supposedly being used to "to reap profits for themselves" and "for their personal enrichment." (As we see, at trial the government at trial shifted from proving misrepresentations – essential to a fraud allegations – to arguing that the payments were "theft.") None of the "diversion" of funds alleged would actually constitute a *federal* crime even if it was a form of "theft."

The primary leg of the government's circumstantial fraud argument is that one could infer fraudulent intent, presumably in all three aspects,[8] from any misuse of the

---

[8] Intent to deceive, intent to cause economic harm to the victim, and intent to unlawfully obtain property of another.

funds when they arrived months after the application for the grant of funds.  Even before we get to the doctrine, culminating in *Contrywide Home Loans*, there is a logical chain of inferences that are missing if we are attempting to equate mere misuse of  money with specific intent to commit a crime in order to get money. Even if the government was able to prove conscious wrongdoing in the "misspending" it has alleged, it has not intimated any kind of evidence which would give even nearly equal circumstantial support,  *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002); *Cosby v. Jones,* 682 F.2d 1373, 1383 (11th Cir.1982), to an inference that the application for UN funds was fraudulent.  In almost any case there is at least equal inference that any "taking" was opportunistic at the time.  The government has not suggested how any fraudulent intent at the outset could be proven "without resorting to speculation and surmise." *United States v. Stewart*, 305 F.Supp.2d 368, 370 (S.D.N.Y. 2004); *United States v. Cassese*, 290 F. Supp. 2d 443, 448 (S.D.N.Y. 2003).

Getting to *Countrywide Home Loans,* that case notes that the government has tried in many cases to equate breaches of agreements with fraud – hoping to dramatically the reach of the fraud laws.  *Countrywide Home Loans* clearly seeks to definitively shut down any such argument.

> [W]here allegedly fraudulent misrepresentations are promises made in a contract, a party claiming fraud must prove fraudulent intent at the time of contract execution; evidence of a subsequent, willful breach **cannot sustain the claim**. Far from being "arcane limitations," *Countrywide I*, 961 F.Supp.2d at 607, these principles fall squarely within the core meaning of common-law fraud that neither the federal statutes nor *Durland* disrupted. *See Neder*, 527 U.S. at 24 ("[Durland] did not hold, as the Government argues, that the [mail fraud] statute encompasses more than common-law fraud.").

*U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc*., ___F.3d ___, 2016 WL 2956743 Slip. Op. p. 14 (May 23, 2016) (Reversing judgment by Judge Rakoff, with $1.2 billion penalties, and dismissing complaint).  Also,

It is emphatically the case—and has been for more than a century—that a representation is fraudulent only if made with the contemporaneous intent to defraud—i.e., the statement was knowingly or recklessly false and made with the intent to induce harmful reliance.

*Id.* at *4.  Furthermore,

Of course, "fraudulent intent is rarely susceptible of direct proof, and must instead be established by legitimate inferences from circumstantial evidence." *United States v. Sullivan,* 406 F.2d 180, 186 (2d Cir. 1969). Nonetheless, where the relevant representation is made within a contract, *the common law rejects any attempt to prove fraud based on inferences arising solely from the breach of a contractual promise*:

[T]hat proof that a promise was made and that it was not fulfilled is sufficient to prove fraud . . . is not, and has never been, a correct statement of the law.

*Tenzer*, 39 Cal. 3d at 30.

*Id.* at *16.  The *Countrywide* opinion goes on at length reiterating this point. See *Id.* at *16-23.  The discussion makes it very clear that intent to defraud at the outset has to be inferred from *something other than* from actions considered contrary to the agreement:

[a]ccordingly, the common law requires proof—*other than the fact of breach*—that, at the time a contractual promise was made, the promisor had no intent ever to perform the obligation

*Id.* at *17.  I.e., the Court did not say "proof–*in addition to* the fact of the breach."[9]

In sum, a contractual promise can only support a claim for fraud upon proof of fraudulent intent not to perform the promise at the time of contract execution. Absent such proof, a subsequent breach of that promise—even where willful and intentional—cannot in itself transform the promise into a fraud. Far from being an arcane limitation, the principle of contemporaneous intent is, like materiality, one without which "the common law could not have

---

[9]  The opinion notes that the government agreed that "fraudulent intent cannot be inferred from a mere breach of contract."  Govt. Brief, p. 44.

conceived of 'fraud.'" *Neder*, 527 U.S. at 22.

*Id.* at *22.  The decision concludes by specifically cautioning against allowing cases like this:

> In essence, the Government's theory would convert every intentional or willful breach of contract in which the mails or wires were used into criminal fraud, notwithstanding the lack of proof that the promisor intended to deceive the promisee into entering the contractual relationship.

*Id.* at *21.

The obvious problem here is that the government relies almost exclusively on the claim that, after receiving the funds, the defendants took money for themselves.  This is nothing other than the kind of "breach of agreement" conduct that *Countrywide* rejects as a basis for inferring fraudulent intent in seeking the grant to begin with.

While we believe that the instructions to the jury were not as forceful as *Countrywide* requires, the government's arguments to the jury were directly  contrary even to these instructions, arguing unqualifiedly that these payments themselves established the requisite "intent to defraud":  "Intent to defraud is right there," [p.11], "Intent to defraud, ladies and gentlemen" [p. 11, 13].  "We trace the money, each one of these eight pots of money. So, onward we go. Intent to defraud." [p. 27]. "[T]ake a look at Government Exhibit 40-O that she showed you, and it will show you how $4,200 was spent to pay his bills. Scheme to defraud. Intent." [p. 29]  "Those eight pots of money are very important in this case in proving what their intent was and what their actions are." Rebuttal, p. 35. "And then we're going to go to the points 4, 5, 6, 7, 8, 9, 10, however many, with our eight pots of money. Every one of these shows you their intent to defraud UNIFEM to get that money." [*Id.* 39] "And who gets the next money? Farah Jamil, Bushra's daughter. Intent to defraud." [*Id.* 40] "And this is a nice summary for you to show you their intent to defraud 17 times in this one pot." [*Id*. 41]

22

> So, if you take six of those pots, plus the 17 and the eight from the other two pots, you come up with 31 separate transactions where they had the intent to defraud UNIFEM to commit a scheme to defraud to get UNIFEM's money to use for their own personal benefit, not for the radio station.

[*Id*. 41]. So the government did everything it could to override any instructions the Court gave to impress the jury with the actual law. This is a tacit admission that, if the jury followed the instruction, it could not convict.

## 2. The government's insistence that the payments constituted "theft" is inconsistent with a claim of "intent to defraud"

The government was caught in a bind. It has admitted from the very beginning that it had no direct evidence of fraud, only "circumstantial evidence" based on the subsequent "diversion" of funds. It is not clear when, if ever, the government actually read the *Countrywide Home Loans* decision which reiterated the unavailability of that logic, but by the end of the trial this seemed to have sunk in. Moreover, it had no evidence that either defendant, by virtue of their signature on a signature page, was aware of or agreed to the provisions of the UNIFEM agreement that the indictment insinuates contained some sort of restriction on how the funds were to be held (but did not actually).

So, unable to show how these payments were contrary to the agreement, which is the indictment's theory, the government sought to rile the jury by repeatedly characterizing the "diversion" payments as "theft" and "stealing" – though *from whom* it never did say. At the same time, the government stridently insisted to the jury that these "thefts" stood as proof of "intent to defraud."

There are three serious problems with this. The most obvious is that in arguing that the jury convict on the fraud counts because of theft, an argument which the jury seems to have accepted, is that it is not what was charged in the indictment. This is addressed below, at p. 31, discussing the prohibition on constructively amending the

23

indictment.

The next problem is that any such "theft" was *from OKI*, which then owned the funds, and not the UN, and OKI was still obligated to provide at least a $350,000 start on a radio station.  So there is no logical connection between such a theft fro OKI and an "intent to harm" of "intent to defraud" the UN or UNIFEM.

The final problem is that, even if the "fraud" were misconstrued by the jury as "thefts" from the UN, as the government surely intended, obtaining property by theft – larceny – is legally inconsistent with obtaining the same property by fraud.  One thing we know for certain from *Countrywide Home Loans* is that the common law understanding of common law crimes still matters.  Fraud requires intent to unlawfully obtain property by means of misrepresentations. Theft is just taking it.  So by switching to a theft theory of the crime, the government has negated the whole idea of "misrepresentations" and "intent to defraud" as means of obtaining the property, even if by some stretch it was the UN's property at the time.

It is worth observing that this is exactly what happens in a judicial culture which abhors making the government particularize what its case is about.  When the government finally get to trial on ill-conceived charges which have  not been given meaningful judicial scrutiny, and not particularized, it scrambles from one theory to another, even contradictory theories, to find something the jury can grasp on to.

Here, from the government's viewpoint, it is better to get the jury riled up about theft, even if it is not really a federal offense, when you have nothing to say at all in support of the actual fraud charges.  The government did its best to dress up its theft theory with the phrase "by means of false and fraudulent pretenses" without ever discussing exactly what pretenses it was referring to, or how they were false.

> And you're going to hear these eight pots of money, each of them
> are involved in the scheme to defraud to obtain U.N. money by
> means of false and fraudulent pretenses, representations or

promises.

[Closing, p. 8. See also p. 9, 23, 24, ].[10]  But with each "pot" of money, the action is just described as theft, and clearly from OKI, but the prosecutor would add "Intent to defraud is right there," or similar language as noted above at p. 25.

What were the "false and fraudulent pretenses"?  The government swaps in the "deception" of how the funds were moved from one account to another ("That is an act of deception by Debbie Bowers in this case" p.11) or "concealing" the payments by not disclosing them in the quarterly report, to serve this role. [Closing p. 13-15] ("Lie. Lie. And another lie. Additional proof of intent to defraud in this case" p. 15). Obviously these "deceptions" were after the grant was made, and therefore not made in order to obtain the grant.  Moreover the government has now shifted to *failure to disclose* as a "misrepresentation," which is problematic in itself,[11] but not what was alleged.

### 3.  The "Financial difficulties" evidence was not legally sufficient to make up for the lack of evidence of intent to defraud.

We believe it was error to suggest to the jury in the instructions that evidence of motive "bears on intent."  There is absolutely no lawful basis for that instruction.[12]

---

[10]  As we have noted, the government overlooked the fact that the "scheme" had been completed before these "pots" of money existed.

[11]  That kind of "misrepresentation" requires proof of a duty to disclose, arising out of a fiduciary duty or contractual obligation.  Here there was no argument that the agreement required disclosure of anything but the expenditures toward the radio station.

[12]  The government's requested instruction 42 is entitled "Using Motive for Intent." The text does not support the title which is taken from a Sand, Seiffert instruction.  As is too common in the Sand, Sieffert book, the title does not correlate with the text. The title groundlessly suggests that evidence of some kind of motive can be substituted for some kind of intent. But the actual instruction proposed only goes so far as to suggest that "the presence or absence of motive is a circumstance which you may consider as bearing on the intent of a defendant." Obviously this is not something tailored to fraud allegations, nor is it cognizant of the cases which rather suggest that motive relates more to issues of identity. The Sand charge is "adapted from" the charge apparently given by the trial judge in the case of *United States v. Cirillo*, 468 F.2d 1233

To the contrary, cases refuse to allow this*, even in a civil context.  Mack Univ. LLC v. Halstead*, No. SA CV 07-0393 DOC, (C.D. Cal. Nov. 14, 2007). ("However, if a desire to make money were the hallmark of an intent to defraud, the Court could assume that any investor acted with scienter in any transaction. After all, the purpose of investment in securities is to make money." *Russell Publ'g Grp., Ltd. v. Brown Printing Co.*, No. 13 Civ. 5193,  (S.D.N.Y. Feb. 05, 2015) at n. 18. ("The Complaint alleges multiple instances of erroneous billing in Brown's favor, and Brown undoubtedly has a motive to make more money. But these facts alone cannot give rise to a strong inference of Brown's intent to defraud . . . .). *Pu v. Charles H. Greenthal Management Corp*., 2010 WL 774335 (SDNY 2010). ("Pu's complaint does not adequately plead a RICO claim. . . . Pu's allegations about defendants' motives require even less discussion; they fall well short of supporting an inference that defendants intentionally lied to unit holders, mortgagees, or anyone else to obtain the assessment monies. . . . *Powers v. British Vita, P.L.C.*, 57 F.3d 176 at 184(2d Cir.1995); *West 79th Street Corp. v. Congregation Kahl Minchas Chinuch*, No. 03 Civ. 8606, 2004 WL 2187069 (S.D.N.Y. Sept. 29, 2004), at *8.").

The proposition that such weak evidence can support the requisite  a chain of inferences needed is not even logical.[13]  Motive is motive, Intent is something quite different.  We also believe it was error not to tell the jury, as we believe Countrywide Homes dictates, that proof of the intent to defraud must be established by evidence *other than* the proof of misuse of funds after they are obtained.

But even under the instructions as given, is it conceivable that the evidence of

---

(1972), a narcotics case, with a citation given to 554 F.2d 54 (2d Cir. 1977).  That decision, on a §2255 petition, has nothing to do with jury instructions or motive.  Nor, for that matter, does the decision on the direct appeal, which involved no question of the propriety of the jury charge.

[13]  We demonstrate in our proposed jury instructions that there are actually three types of intent to be proven: intent to deceive, intent to wrongfully obtain property, and intent to economically  harm the victim.  Obviously none of these can logically be found on the basis of a motive, no matter how strong, to "make money."

"motive" offered here is enough to satisfy the *Countrywide* principle?

The evidence of "financial difficulty" presented by the government fell far short of proving a motive to obtain money unlawfully, especially through such an improbable means as planning to build a radio station in a war zone, hoping to skim money off unnoticed.   The evidence was weak, and very imcomplete.  Of the copious financial testimony elicited by the government, none of that evidence included a financial analysis of Mr. Jabar's net worth. And the hypothesis cannot be squared with the reality that Mr. Jabar's motives clearly led him in the opposite direction, becasue he reckelssly incurred more debt to bring it about – even when UNIFEM abandoned OKI.

### "Motive," no matter how strong or urgent, cannot be substituted  for the proof of the specific intent to misrepresent or to cause harm that is required in a case of fraud

Since almost any one can be considered motivated to obtain money, something more acute is generally required than just showing indebtedness.  In *United States v. Mullings*, 364 F.2d 173 (2d Cir. 1966) the defendant was charged with theft of property. Evidence that he used narcotics and that his take-home pay was under $65 per week was offered to show motive. The court held that though a lack of money may be admissible to prove motive, and to prove identity, this particular evidence was inadmissible because "the chain of inferences" with respect to the defendant's need for funds was "too speculative," *id*. at 175, and was outweighed by the prejudicial effect of the evidence of his narcotics addiction.  *Id*. at 176.

In *United States v. Mitchell*, 172 F.3d 1104 (9th Cir. 1999), the government also sought to use evidence of poverty as proof of motive, and again motive was relevant to the issue of identity of the defendant as the culprit.

> As indicated above, the prosecutor faced some difficulties in proving that Mitchell was the robber. One of the devices she used was to show that Mitchell had motive: he needed the money

27

because he was poor. This evidence was a major part of the trial.

*Id.* at 1104.  Here a good percentage of the government exhibits and a good percentage of its witnesses seem to be devoted to this idea.

But, as noted in *Mitchell,*

> Poverty as proof of motive has in many cases little tendency to make theft more probable. Lack of money gives a person an interest in having more. But so does desire for money, without poverty. A rich man's greed is as much a motive to steal as a poor man's poverty. Proof of either, without more, is likely to amount to a great deal of unfair prejudice with little probative value.

*Id.* at 1108-09.

## G.  The government was allowed to pursue shifting theories of criminality

We believe that we have demonstrated that no rational jury could have convicted on the fraud theory that is actually articulated in the indictment.  That argument is supported by the fact that he government, apart from its failure of proof,  only argued in support of other theories of criminality than what was charged in Counts 1 and 4. But even if the Court were to disagree that the evidence on these Counts was sufficient, a new trial is required because it is clear that the jury must have, or may as well have, decided the case on the impermissible legal theories which dominated its evidentiary presentation and argument to the jury.

It was clear from the very first witness, Mr. Guha,  that the government was not even able to prove that the defendant's had actually made the representations alleged in the indictment.  Mr. Guha observed that there was only a single signature page signed by Mr. Jabar in December of 2004, and that, to his knowledge, no one had negotiated with him over, or informed him of the amendments that the body of the agreement made to what he had previously signed the month before.  The government also knew what we have pointed out in detail above, about the actual failure of those representations to

28

include what the government needed to prove, that somehow the defendants had represented that the actual dollars received from the UN would be segregated and not commingled with its other assets and netted against expenditures on the radio from other sources.

So the government began as soon as possible to focus on other theories of criminality than the fraud charged in the indictment: different "false representations," different members, and abandoning fraud in favor of theft as the basis for conviction.[14]

### 1.  The government focused on different "false representations" than alleged in the indictment.

Primarily this had to do with the representation as to who, and how many, were on its board of directors at different times.  This served multiple purposes.  This sleight of hand was unnoticed, under 404(b), allowing inadmissible evidence of propensity to dishonesty, evidence of "false representations" not alleged in the indictment.  We specifically objected numerous times to allowing the government to migrate to such "false representations" but the Court refused to limit this type of evidence.  And so this continued right through the government's closing to the UN where, long before its very cursory mention of the terms of the UNIFEM agreement , the government jumped into an extensive rant on the "11 board members" and the various witness' testimony about who the board members were, suggesting that this all constituted misrepresentations about who the board was and about who was running OKI:

> The proposal talks about 11 board members that governs
> the decision-making process and oversees the financial aspect of

---

[14] This was presaged prior to trial.  "As the government has stated in the past, the pending charges involve Jabar's credibility and relate to the *theft of United Nations grant money* and lying to a federal agent." Dkt. 329 p. 4, (*emphasis added*); "All the counts are related to a scheme to defraud the United Nations (U.N.) involving the *theft of money* received pursuant to a U.N. grant." Dkt. 260 p. 1; "The pending charges involve Jabar's credibility and relate to the theft of U.N. grant money and lying to a federal agent." Dkt. 320 p. 6.

OKI. You've heard three of the board members come in starting with Mike Bowers, Debbie Bowers' husband. He didn't tell us about 11 board members.  He couldn't come up with 11board member names.  And you'll recall there were questions about different people who had been listed and who knew who, and various people didn't know some of the names on it.

John Leamer was another one that came in that you heard from. He was the one that lost interest after a few months. He didn't give you 11 names, either. He told you he was there at the inception, he signed the paperwork for OKI. Jim Trowbridge, he was not happy to be here, as you saw, but he couldn't give you 11 names, either. And you'll recall Ms. Kresse asked about various names.

And then also Barbara Uthman came in. You'll recall she was the sweet lady that Attorney Brown asked how old she was, and she told you she was 80. She was the woman who had been caring for her husband, and she told you that at the time that her husband became ill, he had Parkinson's, she wasn't involved with OKI at all. And she told you that her husband died in 2005, and she did not resume any activities with OKI. And yet, her name ended up on paperwork in 2006, and there was no way she was involved. None of them talked about having any decision making when it came to the radio station. None of them were involved in the financial aspects of the radio station, the radio station that's being run by OKI.

The witnesses are telling you that OKI is essentially Steve Jabar and Debbie Bowers.

[Closing, p. 5-6].  In light of the consistent refusal of the Court to curb this variant approach, any objection to this would only have highlighted it, and confirmed for the jury that it was permissible to consider it in any way it wanted as evidence of guilt.

The government introduced a completely new theory in its closing argument: that the defendants were acting in concert with Bushra Jamil and that they failed to disclose to UNIFEM that Bushra was personally in support of the radio station project.  This combines the frequent assertion previously made by the government that Bushra Jamil was a co-conspirator with a very special kind of "misrepresentation" – the *failure to disclose.*  [Govt. Closing, p. 5.] As we pointed out when the government first attempted

to interject the idea that Ms. Jamil was an unindicted co-conspirator, the indictment does not allege any "others" as part of the "conspiracy."   Moreover, the accused cannot be liable for what she may or may not have disclosed to UNIFEM, though her testimony was clear that she was in the position she was in order to actually advocate from the perspective of an Iraqi woman for projects that would benefit Iraqi women.  It was, in essence, part of her job to be an advocate and assist an organization to make an effective proposal and carry it out.

> Q. Were there problems where there was prior to it getting
> signed, there was questions as it whether or not it was
> actually going to be approved?
> A. Yes.
> Q. And UNIFEM in New York had issues and you were aware of
> that?
> A. Yes.
> Q. So, you're telling OKI basically to beef up their
> proposal?
> A. It was my job, yes. It was my job to do that.

Govt. Cross of Bushra Jamil, p. 189

But the point is that the closing was simply testimony by Ms. Grisanti, as Ms. Jamil was not even asked about what she disclosed or should have disclosed to UNIFEM.

The government insisted that there was something insidious about this, clearly urging the jury to see this as constituting a fraud on which they could convict.

## 2.  *Shifting to different theories of criminality was a fatal variance*

Compliance with Rules 7(c) and 7(f)

> fulfills the Sixth Amendment right to be informed of the nature and
> cause of the accusation; it prevents a person from being subject to
> double jeopardy as required by the Fifth Amendment; and it serves
> the Fifth Amendment protection against prosecution for crimes
> based on evidence not presented to the Grand Jury.

31

*United States v. Walsh*, 195 F. 3d 37,  44 (2d Cir. 1999); *United States v. Crowley*, 79 F. Supp. 2d 138, 153-54 (E.D.N.Y. 1999).  See also, *United States v. Silverman*, 430 F.2d 106, 110 (2d Cir. 1970) (analyzing evidence to "insure that the defendant was not tried upon a theory or evidence which was not fairly embraced in the facts upon which the grand jury based its charges"), modified, 439 F. 2d 1198 (2d Cir. 1970).

A "fatal variance" occurs "when the defendant is prejudiced in his defense because he cannot anticipate *from the indictment* what evidence will be presented against him . . . ." *United States v. Ratliff-White*, 493 F.3d 812 , 820 (7th Cir. 2007) (*emphasis added*). "When . . . *the indictment* gives a defendant particular notice of the events charged, and the proof at trial centers on those events, *minor differences in the details of the facts* charged, as contrasted to those proved, are unlikely to be either material or prejudicial." *United States v. Reeder*, 170 F.3d 93, 105 (1st Cir. 1999); *United States v. Ajayi*, 808 F.3d 1113, 1125 (7th Cir. 2015).

A constructive amendment is not permitted at trial; it requires reversal without regard to prejudice.  *United States v. Ansaldi*, 372 F.3d 118, 127 (2d Cir. 2004); *United States v. Clemente*, 22 F.3d 477, 482 (2d Cir. 1994). A constructive amendment effectuated by a variance of the indictment stands as an acquittal of the original charges. *Epstein v. United States*, 174 F.2d 754 (6th Cir. 1949); *United States v. Eaton*, 501 F.2d 77 (5th Cir. 1974); *Virgin Islands v. Aquino*, 378 F.2d 540 (3d Cir. 1967); 41 Am. Jur. 2d Indictments and Informations § 261.

Constructive amendment of an indictment is a "serious error."  *United States v. Ansaldi*, 372 F.3d 118, 126 (2d Cir. 2004).  It occurs when the "government's presentation of evidence and the district court's instruction combine to 'modify essential elements of the offense charged to the point that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged by the grand jury.'" *United States v. Vebeliunas*, 76 F.3d 1283, 1290 (2d Cir. 1996) (quoting *United*

*States v. Clemente*, 22 F.3d 477, 482 (2d Cir. 1994)).

The prohibition on a constructive amendment of the indictment certainly applies to changes in the specific material misrepresentations alleged in the indictment. *See United States v. Lander*, 668 F.3d 1289, 1295-1297 (11th Cir. 2012) (Finding constructive amendment where indictment alleged defendant misrepresented necessity of bond purchase, but at trial sought to convict based on representations that defendant could circumvent regulatory process for developers.)

> "a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *United States v. Delano*, 55 F.3d 720, 729 (2d Cir.1995) (quoting *United States v. Mollica*, 849 F.2d 723, 729 (2d Cir.1988) (internal quotation marks omitted)). "A constructive amendment is a per se prejudicial violation of the Grand Jury Clause of the Constitution." *Thomas*, 274 F.3d at 669; *United States v. Frank*, 156 F.3d 332, 338 n. 5 (2d Cir.1998).

*United States v. Guevara*, 277 F.3d 111 (2d Cir. 2001).

Here the numerous ways the government shifted from the indictment, which it knew it could not prove, requires dismissal.

## H.  The government never even attempted to disprove the good faith defense

Good faith is a defense.  It must be disproved beyond a reasonable doubt.  The government did not seek in any respect to do this.  The government did not disprove the expenditures on the radio station, or the reasonableness of the defendant' belief, as told to Agent Klimczak, that the "private payments' were offset by the larger expenditures and obligations incurred by Mr. Jabar to get the radio station going before the UN money could work its way to Iraq.

Rather, the government's approach throughout he case and the trial was to simply ignore the evidence, or take pot shots at it, as if it was the defendants' burden of persuasion.  That will not do.

33

# Motion to Dismiss: Count 1 – Where the alleged conspiracy is completed, acquittal or dismissal of the substantive counts requires dismissal of the conspiracy

It is theoretically possible to conspire to commit substantive crimes without committing the substantive crimes.  However, where the conduct alleged to constitute the conspiracy was completed, and that conduct also is identical to the conduct alleged to have established the substantive offense, then the acquittal on the substantive offense requires dismissal also because the completed conduct in any way fails to constitute an offense.

This is especially true when the failure of proof on the substantive offenses includes the various mental elements involving intent, knowledge and willfulness, required for the other offenses.

In this case, there is 100% congruency between the conduct alleged to constitute the substantive offense and the conduct constituting the conspiracy. Each of the fraud counts expressly incorporates all the factual allegations in ¶¶1 through 35.  Though this is, to some extent, qualified by the government's admission that the fraud was complete with the transfer of the UNIFEM grant funds, to that extent the conspiracy itself has to be limited in its scope to the same extent, the government's claims fail.

The usually hypothetical and mythical "conspiracy to cover up" which the government so frequently invoked during the trial to get evidence admitted, is to no avail either.  There can be no conspiracy to cover up what is not in fact a crime.  Moreover, any conspiracy to commit the conduct occurring after December 14 would be a conspiracy either  to commit "theft" as the government has finally characterized the "personal expenditures" (which we have shown above is inconsistent with a conspiracy to defraud),

or a conspiracy to defraud the UN in order to obtain the remaining $150,000 owed on the grant, which is a completely distinct offense from what is charged in the indictment.

As Mr. Guha pointed out, the representations attributed to the Standard Project Cooperation Agreement only related to whether the additional $150,000 would be released.  The first $350,000 came simply on the basis of signing the agreement. Therefore, even if there were representations in the quarterly report, which the government has also not proven, those representations could only go to the possibility of a different scheme to defraud in relation to the $150,000.

Essentially, accepting the extensive failures of proof on the substantive charges, the conspiracy charge cannot be sustained at the same time that substantive charges are dismissed.

Invocation of the theoretical possibility of committing a conspiracy offense without committing the object offenses of that conspiracy, as if the accused were operating in two parallel universes, is to no avail.  In this regard we note that in *Countrywide Home Loans* itself the Second Circuit noted that the statute covers both the substantive crimes and conspiracy, and specifically ruled that the failure to prove the intent to defraud at the time of, in this case, seeking the grant, is fatal also to the conspiracy form of the offense also: "the Government has failed to prove the necessary FIRREA prerequisite—i.e., a violation of (*or conspiracy to violate*) § 1341 or § 1343." (*Emphasis added*)

# Motion to Dismiss:  §1001 Charges

The §1001 counts fail because, with no evidence of actual fraud, the "misspending" of funds was not a federal offense and so the "matter" about which the defendants spoke was not "within the jurisdiction of the . . . United States." Additionally, the evidence is clear that the statements of both defendants were not of the material type which could have influenced to investigation which had already settled on the facts it was

interested in and was focused only on eliciting evidence of lying or guilt. Finally, the evidence was legally insufficient for all of the counts of conviction.

## A.  The evidence of knowledge and intent to deceive is missing

Based on Agent Klimczak's testimony about the manner in which Ms. Bowers was questioned, and the explanations she gave at the time of the interview, no rational juror could conclude, beyond a reasonable doubt, that Ms. Bowers or Mr. Jabar intended to deceive Agent Klimczak at any point during the interview.

The Court should be reminded of what the government's evidence showed in common to both these interviews, with one exception.  These were both ambushes, for which Agent Klimczak was completely prepared, having investigated the matter for over a year and having collected all the records.  He had made up his mind on the wrongdoing. All that was left was to get admissions to use against the defendants, or "lies" he could charge them with.

### 1.  The Jabar interview

Agent Klimczak testified to his recollection of the video conference interview of Steve Jabar in 2006.  This interview is the only evidence offered by the government in support of the §1001 charge contained in count 14 of the indictment.  The government in closing argued that Jabar lied about using all of the U.N. funds for the radio station. (Government closing argument, p. 22)

However when this testimony is reviewed in as a whole it is clear that it does not support verdict on this count of the indictment.  This was exactly the same statement, in the same context and with the same understanding, as the statement for which Deborah Bowers was acquitted on Count 10.

And, apart  that answer, from Mr. Jabar's perspective, which surely had in mind all the contributions he had made or obligations he had incurred well above the UN funds, he

36

answered truthfully everything else.  When Agent Klimczak asked Jabar about the payment to Bassam Bitar, Mr. Jabar told him that Bitar was a friend to whom he owed money and that the cashier's check to him was a payment made from U.N. funds. (Klimczak transcript, 8/18/16 at p. 42-43)

Jabar truthfully admitted he repaid a $10,000 loan to Saad Almizoori from U.N. funds. (Klimczak at 47)

Jabar admitted the $1,500 sent to the daughter of Bushra Jamil, but honestly said he wasn't certain of the source of the funds.  He admitted the $7,219 Key Bank check that was used to pay his property taxes, that it came from UNIFEM funds and that doing so was a big mistake. (Klimczak at 63-64)  Furthermore, he admitted that this money was not used for the radio but instead was used for himself. (Klimczak at 65)

Mr. Jabar admitted the  $5600 check made payable to him, with the notation "general manager," noting that he frequently used his salary for radio station expenses. (Klimczak at 67)

Jabar's admitted to a $10,000 wire transfer made to him in June 2005, saying that he was not sure what it was for but noting that this personal account was used to transfer radio funds, another statement not alleged to be false. (Klimczak at 69, 73)

He admitted to the $10,000 check to Basam Bitar, saying that he probably asked Deborah Bowers to help because he owed money and didn't want to embarrass himself and he knew that wasn't the way to operate.

Finally, Mr. Jabar admitted to a $4200 wire transfer. (Klimczak, at 80)

None of these statements by Jabar were alleged to be false, only the very first statement of his position that $350,000 did go to the radio station.

With this backdrop of numerous statements admitting the most damaging facts of the case, the single statement, nearly identical to that of which Deborah Bowers was

acquitted, any reasonable juror must have had a reasonable doubt about whether that one statement – if it really was what Jabar said – was intentionally and knowingly "false" as an assertion of fact.

## 2.  *The Bowers interview*

Bowers was also ambushed, on July 20, 2006, a month before Mr. Jabar.  Unlike him she did not have any forewarning of the existence of an investigation.  And she was not warned about §1001.  The jury acquitted her of making a false statement to the effect that "all the money went to the radio station," the jury apparently agreeing that this was true according to her understanding of how things balanced out, and she readily admitted all the other transactions Klimczak had tracked down.

After that, Ms. Bowers readily admitted a number of transactions: the check to Bitar [Klimczak at 222], the Saad Almizoori [223], the money to Farah Jamil [223], a check to Mr. Jabar, #1003 as reimbursement for travel [224], check 101 to Jabar in the amount of $709 [224]; a $3000 check to Jabar for travel [225].   None of these were alleged to have been false or deceptive statements.

But then he asked her about check103,  the $7364 she used to pay down her own credit card the that she said was reimbursement for radio expenses.  Agent Klimczak already had his own theory of how that had been a personal expense and so he pulled out her credit card statements which showed transfers of balances from other credit card accounts, in amounts of around $3500 and $4000, which he got her to admit were not balances that were for radio station expenses. Satisfied with this, in the interview he moved on.  But in his testimony he had to agree that he never came back to resolve why she believed that this was a radio station expense (which did not prevent the prosecutor from claiming that it was not for the radio).   Nevertheless, none of this was alleged to be false.[226-227]

Likewise she informed him about a $9000 check she claimed was cash for Jabar to

carry to Iraq for the radios station, and this was not alleged to be false. [227]

But then we come to Count 11, and he shows Ms. Bowers a check with the memo "VOW Radio."  Klimczak even admits that when she said that was for the radio station she did so because she was following the notation.  "[Y]our notes even say she knows this because of the notation, she said it was related to the radio station? A. Yes" [228].When he showed her that the check did not get used for the radio station she readily agreed and corrected herself.

> Q. It's . . a reasonable possibility that when she first saw that check, that she wasn't lying to you, she just didn't remember and was going by what's on the check?
> [*Objection overruled*]
> THE WITNESS: I don't know what she was thinking at that point.

[229] So, with this background of honest admissions to equivalently incriminating events, and the Agent's testimony that the witnesses' answer was expressly in reliance on the memo on the check, and bearing in mind that Ms. Bowers had no clue that making a mistake in this quiz itself could carry a 5 year criminal penalty, and in light of the jury instructions that later corrections or explanations have to be considered, there must be a reasonable doubt in the mind of any rational juror about whether this answer was a deliberate falsehood, rather than just an honest mistake understandably prompted by the notation on the face of the check, by someone simply doing her best to answer?

From there, Agent Klimczak moved on to check 112 to Jabar, the "general manager" check, and another for $2000 to Jon Powers, and a later $3000 check to the public relations company, with none of her answers being suspect.[229]

But next comes a $10,000 wire transfer which Deborah assumed from the amount and her recollection of efforts to wire money to Jordan, was for the radio station, but she was mistaken. This was Count 12.

> Q. But as soon as you showed her the -- where the money actually
> went, she then told you the story about that, correct?
>
> A. Yes.
>
> Q. So, here again, it's a situation that it's possible she just didn't
> really remember, and she just was making an assumption?
>
> [*Objection overruled*]
>
> THE WITNESS: Again, I don't know what she was thinking when
> she told me that.

[230-231] The same situation appeared with respect to a wire transfer in the amount of $4200, that was the subject of Count 13.

Agent Klimczak then went through a number of other transactions with her, showing her what happened and getting her recollection of it, and again this more direct approach did not result in any claimed effort at deception. [232]

After that questioning Klimczak testified to numerous contacts with Bowers, including phone calls, personal meetings, and efforts by her to provide documentation. None of this is consistent with any intentional deception, and in every instance charged under §1001, she immediately acknowledged her mistakes which are clearly indicators of lack of recollection, because there would have been no reason for her to select out these particular transactions to try to deceive Agent Klimczak, having disclosed so much and in every instance acknowledging the true facts when her recollection was refreshed.

Based on the above, any rational and reasonable and fair juror must have a reasonable doubt about Deborah Bowers guilt on Counts 11, 12 and 13, just as they did on Count 10.

## B.  The materiality of the false statement charges has not been substantiated

A statement is material if, under the circumstances, "it has a natural tendency to influence, or [be] capable of influencing, the decision of the decision making body to which it was addressed,  or if it is capable of distracting government investigators'

40

attention away from a critical matter." *United States v. Adekanbi*, 675 F.3d 178, 182 (2d Cir. 2012) *citing United States v. Gaudin*, 515 U.S. 506, 509 (1995); *United States v. Stewart*, 433 F.3d 273, 318 (2d Cir.2006) (internal quotations omitted).

The government has failed to offer any evidence to support this element; rather, the testimony of Agent Klimczak precludes such a finding.

By the time Agent Klimczak interviewed Debbie, his mind was made up. Although he denies he was seeking a lie, Agent Klimczak admits that, at the time of the interview, he was already aware of the path of the $350,000 grant, and that Ms. Bowers' response to his inquiry in that regard would not change his course of investigation or change his belief that the funds were misused. Agent Klimczak testified that he already knew the answer to the question he posed to Ms. Bowers which elicited the statements that are the subject of the §1001 claim.

> Q. Again, I mean, these -- with respect to that -- that – that example and the prior check, you could have said, look, we've got all this money that we see this wire transfer, Mr. -- Mr. -- Mr. Jabar, and here's what looks like Mr. Jabar about did -- did with it, and tell us about it, right?
>
> A. I could have asked her that way, yes.
>
> Q. Okay. But you showed her -- just showed her the wire transfer to see what she would say?
>
> A. Yes.
>
> Q. To sort of see if she would lie?
>
> A. No.
>
> Q. Okay. To see if she remembered?
>
> A. Just to see what she would say. How she would describe it.
>
> Q. And she came up with an answer that turned out not to be accurate?
>
> A. That's correct.
>
> Q. Okay. And on -- and you already knew with respect to the two checks previously mentioned, and there's the wires and the checks, you already knew where they went?
>
> A. I did.
>
> Q. You weren't depending on her to tell you where they went?

41

A. No.

Q. **It wasn't going to change your investigation if she said it one way or another?**

A. **No.**

This admission negates the necessary element of § 1001 that the false statement was material to the investigation, in the sense that it must be capable of influencing the investigation in some meaningful way.

The very same thing applies with even more force to the interview with Mr. Jabar. This was a "chess match" for Agent Klimczak, by his own admission, and it was merely an effort to trap him into admissions, not an effort to edify himself to help map the course of further investigation.  The only interest was in whether he would incriminate himself or be caught lying.   This is not the point of §1001.

## C.  The jurisdictional element in the false statements charges has not been substantiated

Because the true basis for the investigation to begin with, and the nature of the offense as actually argued to the jury, was in the nature of "theft" from an organization, the matter under investigation was only cognizable in state court. The desire of the agent, or the USAO to make a "federal case out of it," contrary to the clear doctrine reflected in *Countrywide Home Loan*, and to pursue it to "neutralize" Mr Jabar, does not make it so. The government has failed to prove beyond a reasonable doubt that the statement made was in a matter within the jurisdiction of a branch of the United States government.

On cross examination, Agent Klimczak disavowed that his investigation had anything to do with the Internal Revenue Code, and affirmed that the investigation was solely conceptualized as pursuing fraud.  Therefore, there is no room for speculation that he also had in mind an income tax investigation of Mr. Jabar or Ms. Bowers or OKI.

A false statement is not a federal offense merely because it is made to a federal agent.  That agent must in fact be engaged in investigating a federal matter.  The

42

government has failed to prove that the underlying matter was in fact a federal matter.

# Motion for a New Trial

District courts are permitted under Rule 33 to order a new trial in the interest of justice. This does not require a finding that the case ought to be reversed on appeal as a result of any error, nor a finding that the verdict was irrational. It is enough for the court to conclude that the result was unjust. However the court is also, in so deciding, empowered to evaluate for itself the weight of the evidence and the credibility of the witnesses. *United States v. Robinson*, 430 F.3d 537, 543 (2d Cir.2005). A new trial can be ordered for any issue which, raised on appeal, would require a new trial.[15]

In this case, if all the charges are not dismissed in their entirety, there must be a new trial of those remaining.

## A. Improper admission and use of evidence

### 1. *The unqualified admission of evidence of "Financial difficulties"*

The government was never specific about the actual point of its "financial difficulties" evidence. It wanted it in because it was useful in tarnishing Mr. Jabar, and was really used as negative character evidence. The unqualified admission of the evidence, however, with no limiting instructions, was error, and the instructions, by being expressly vague about it, allowed the jury to swap very weak evidence of "motive" for the

---

[15]   That is the very function of Rule 33, which was designed to allow Courts to resolve certain errors without waiting for remand from an appellate court. *See Smith v. United States,* 283 F.2d 607, 610-611 (D.C.Cir. 1960) ("The provision that if an appeal is pending the court may grant the motion only on remand of the case, is intended to change the existing practice pursuant to which a remand of the case from the appellate court must be secured before the motion for a new trial is made in the trial court. Under the proposed rule a motion for a new trial could be made without securing a remand. If, however, the trial court decides to grant the motion then, prior to the entry of the order granting it, a remand will have to be obtained.")(quoting Advisory Committee Notes to Fed. R. Crim. P. Rule 33).

very strong evidence ("beyond a reasonable doubt") required regarding *some kind of intent.*

We pointed out, and expressed in our proposed jury instructions [№ 52], usually having a "motive" is related to the identity of the perpetrator of an obvious crime like a bank robbery, as in *Mullings* and *Mitchell* above, at p. 27.  Here the government has not articulated any question of identity of a perpetrator to a *known crime*. Rather, here the government used motive as a way to suggest that there *was an offense* at all.  *I.e.* because he needed money so badly, what otherwise is a straightforward grant proposal must have been fraud.

The prosecution here did what was done in *United States v. Mitchell,* 172 F.3d 1104, 1110 (9th Cir. 1999)*:*

> At a subsequent pretrial conference, after the judge said that "just general testimony that someone is poor would be inappropriate" and asked for clarification of the prosecutor's proffer, the prosecutor said "it would not be our intent [to] introduce evidence that because the defendant is poor, he's likely to commit a crime." But she did.

*Id.*

> The prosecutor did not merely show that Mitchell would be better off if he had a few thousand dollars more. She effectively portrayed him as a feckless man who did not support his wife and children. She showed with the poverty evidence that Mitchell let his wife draw welfare while he went to the basketball court, lived on his parents' bounty at an age where most people do not, and let his family get evicted from their apartment. Jurors' feelings about a man who lives that way have no legitimate bearing on whether he should be convicted of robbing a bank. That a person is feckless and poor, or greedy and rich, without more, has little tendency to establish that the person committed a crime to get more money, and its probative value is substantially outweighed by the danger of unfair prejudice. The district court's discretion was not broad enough to allow admission of the evidence of Mitchell's impecunious financial circumstances.

*Mitchell, supra*, at 1110.

The disproportionately numerous financial records gathered regarding Jabar's bills, debts, late payments, etc., were simply designed to show bad character, and not any relevant "motive." And even if just "motive," it is the weakest sort of evidence.  However here, the instructions and the government's emphasis on it, catapulted this evidence into grossly outsized significance.  The instructions then allowed the jury to consider as "bearing on intent," which provides no guidance on its use, and which has no basis in law.  The jury should have been told that this evidence cannot make up for the inability of the evidence of "misuses of the funds" after the grant was received to establish intent to defraud, under *U.S. ex rel. O'Donnell v. Countrywide Homes,*  --- F.3d ----, 2016 WL 2956743 (May 23, 2016).

Of course the jury was given no guidance on this, and so it must be assumed that the jury found "intent to defraud" merely on the basis of "financial distress."  The mischief of the instruction, as we repeatedly pointed out, is that it says that evidence of motive "bears on intent" which fails to guide the jury on *which intent* is being considered. Intent to deceive? Intent to cause economic harm? Intent to unlawfully obtain property of another?  Or all three at once?  Since these three different kinds of intent which are required to be proven, and cannot be proven by the same facts, were not identified and distinguished for the jury, the undifferentiated permission to use the evidence as "bearing on intent" compounded the problem of not fully enumerating the elements of the offense so that the jury would have an accurate checklist of what had to be proven.

## 2.   The improper admission and use of purported violation of tax regulations

Over well-briefed objection, see Dkt#361, p. 11, the Court allowed the government to admit evidence that OKI had not filed tax forms related to the receipt of the grant funds.  There was no clear purpose for this except to show propensity to violate the law.

This was an issue that arose completely independent of any particular use of the funds once received, so it had no probative value on any original purpose in seeking the grant. The Court's instruction that the propriety of this non-filing was not an issue for the jury does not undo the harm of allowing it in to evidence to begin with, again, with no qualification on its use.

The admission of this evidence was squarely in violation of Rule 404(b) as the government then finally argued it as probative of "intent to defraud."

> There was testimony that they didn't file a 990 form. The form that
> you file with the IRS for a not-for-profit. The form that requires the
> not-for-profit to report all income and disbursements, both income
> and disbursements. *Intent to defraud.* [ Closing p. 15]

However, Rule 404(b) is the exclusive avenue for the admission of prior uncharged acts as bearing on "intent" in relating to the present offense. The government sandbagged the Court and defense on its intentions in offering the evidence [it never addressed our arguments in its responsive pleading, Dkt#369], but the Court still allowed it in without any limits on its use. For all we know it was the sole basis for the jury concluding that there was intent to defraud, months earlier, in connection with seeking the grant.

### 3.  *The improper admission and use of Ex. 30B*

We extensively briefed the issue of the inadmissibility of this email exhibit. The government never honestly admitted its purpose, making impossibly attenuated claims that it somehow went to the uncharged "conspiracy to cover up" the conspiracy.

But the sole point of this was to add to the suggestions that Deborah Bowers was not honest and that she had lied on this topic to Agent Klimczak, even though there were four counts charging §1001 already! Given the fact that the jury did convict on §1001 on some of these counts, the admission of this unnoticed 404(b) evidence was highly and unfairly

46

prejudicial.

### 4. Improper admission and use of claims about inadequate corporate governance at OKI and claims about representations about board membership

The government, over repeated objections about constructively amending the indictment, and prejudicial-but-not-probative evidence, and Rule 404(b), was allowed to spend inordinate amounts of time (exponentially greater than in discussing the actual representations in the indictment) discussing the "11 board members" and whether there was an active board, and who was on the board, which it repeatedly called representations" that it insinuated were false.  This again was classic "404(b)" prior conduct, which was not noticed, and admitted without any limitation on its purpose, and was argued to the jury extensively over three pages of the closing [p. 5] to get the jury to rely on "misrepresentations" other than what is alleged in the indictment.  The probative value of their evidence was *nil*, and yet, especially when one adds up all this unnoticed and unlimited  "prior bad act" evidence, it is highly prejudicial as painting Deborah Bowers as dishonest or untrustworthy.

As noted above, the cautionary instructions, to the effect that these were not issues in the case, could not wipe out the problem of admitting it to begin with.

## B.  Use of false testimony by the government

The defense of "good faith" was raised, principally by pointing to the obligations incurred, and expenditures made, on behalf of OKI toward the radio station by Mr. Jabar, which always exceeded the supposed "diversions" of funds, and which ultimately far exceeded the $350,000 grant, and significantly exceeded the $500,000 amount which the UN originally  promised.  We first established that Agent Klimczak did not investigate this in relation to Bushra Jamil:

> Q. But she had -- she had made this additional statement trying, as

47

another way to explain to you, by what she meant by all the money being sent to Baghdad?

A. I don't know if that was an explanation, but that is what she said to me, yes.

Q. She told you that money to keep the radio station going was coming out of Jabar's pockets, Jabar pockets and Jamil's pocket?

A. That's correct.

Q. Jamil was Bushra Jamil?

A. Yes.

Q. And do you -- did you ever investigate how much money, if at all, Bushra Jamil advanced toward this radio station project?

*A. I would have no way to do that, no.*

Q. Okay. Well, you never called her up and asked her, did you?

A. No.

[Mahoney, Cross, p. 205].  So here the Agent is telling the jury that the government would not have been able to check on this.  Agent Klimczak acknowledged that there were situations where the IRS was in fact required to follow leads from taxpayers in "net worth" prosecutions, and he recognized that Debbie Bowers was giving him "leads" indicative of her good-faith defense.  The government failed  to follow the "leads" given by Debbie Bowers concerning these expenditures which the agent clearly understood were considered by the defendants as demonstrating their good faith.  Nevertheless he did not follow them.

Q. But if a taxpayer says to you, wait a minute, I got this because I inherited this from my uncle, and I found gold in my backyard and, you know, I won the lottery in Canada, right, do you go out and you check those leads out, right?

A. Yes.

Q. So, Debbie Bowers is giving you leads as to how, even though money from the U.N. may have gone into one pocket, out of the other pocket the radio station was getting built and put together in Iraq, right?

A. Right.

Q. All right. Did you follow those leads?

48

> A. No.
>
> Q. All right. And that's because for you, the problem here was that the U.N. money wasn't going to where the – just where the U.N. money – where the U.N. intended it, correct?
>
> A. Correct.
>
> Q. And that was based upon the U.N. agreement that said the money should go to where it was intended, right?
>
> A. Yes.
>
> Q. And that is really the basis for your investigation and presentation to the grand jury?
>
> A. Well, they definitely got the benefit of the money, that's what I was following, yes.
>
> Q. On that end. So the money was diverted there, but – and that's all you were looking at?
>
> A. That's what I was looking at, yes.
>
> MR. MAHONEY: That's all I have.

[*id*. 236-237].

Mr. Brown had previously challenged the failure of Agent Klimczak to have investigated what had happened to funds that were deposited in the bank in Jordan, and was told by the agent that agents could not go to the bank, "that is not the process," and that the only process was through the "Mutual Legal Assistance Treaty." On redirect, he testified that we do not have a "treaty" with Jordan, meaning an MLAT treaty. [p. 249] There was no further mention of foreign investigation until Mr. Brown asked this toward the end of his cross examination:

> Q. Was any effort made to contact the radio station in Iraq directly to say did you get this money?
> A. No.   [p.264]

The complete questioning on the next redirect was devoted to leading the witness to say that so such investigation was possible:

> Q. Mr. Brown just asked you if you had contacted the radio station directly in Iraq to get additional information about your investigation –

A. Yes.

Q. – do you recall that? [*no answer*] And are you able to contact the radio station in Iraq directly in the course of your investigation?

A. I don't recall if I was able to do that, or not.

Q. Would it require either an MLAT or some other means, or are you allowed to pick up the phone and call another country as a federal agent?

A. No, you cannot do that, you need have some means in order to obtain information.

[p. 265-66].  Mr Brown pursued this topic further on a recross and the witness waffled as to whether *Agent Reynolds*, in Baghdad could have just walked over to the radio station to investigate in:

Q. And he could have just gone over to the radio station and knocked on the door and said are you willing to cooperate with me, couldn't he?

A. I'm not sure during that time frame if he was able to do that.

Q. You don't know one way or the other?

A. I don't.

Q. Did you ask him to do it?

A. No. [p. 266-67]

Not content to leave this up in the air, the AUSA did her best to insure that the agent negated the possibility of such an investigation *by anyone*:

BY MS. GRISANTI:

Q. Are federal agents allowed to have direct contact with another country?

A. No.

Q. If a federal agent wants to interview someone in another country, does that require some legal process such as an MLAT or letters rogatory?

A. Normally, it does. Not in all cases. As far as making a contact, is what you're referring to, correct?

Q. Correct.

50

The prosecutor then turned to Agent Reynolds specifically, asking:

> Are you aware of whether or not Agent Reynolds could have
> conducted an investigation in another country?
> Q. In Iraq?
> A. No. Not aware.
> MS. GRISANTI: I have nothing further.

So the focal point at the end of the testimony of the last government witness, the case agent, the primary investigator, was on the government leading him to provide an excuse for the failure of the government to even investigate the leads given to him regarding the "good faith" of the defendants – the excuse being that the government could not conduct such an investigation, even by picking up the phone or walking over to the office.

However, this evidence, and the broader insinuation that the government could be excused from investigating whether, how, and from what sources, the radio station was established, was false.

On June 29, 2007 the FBI posted the summary titled, "The FBI in Iraq." [Attached as Exhibit B] As stated by the FBI in this document, "our Baghdad office was officially opened in the U.S. Embassy in March 2005, though our people were in the country two years earlier.  Today, we have dozens of special agents, intelligence analysts, and other professionals in Iraq, making it one of our largest international contingents."

As one of the few examples of FBI missions in Iraq the document also states, "We investigate crimes committed by Americans against the Iraqi people, as well as those Iraqis commit against their fellow citizens.  In concert with several other U.S. agencies, we recently created a major crimes task force that investigates some of the worst crimes committed by Iraqis against other Iraqis."

Also provided is another critical statement, "Third, there are far more U.S. agencies and actors to coordinate within Iraq, not to mention the many international

partners."

One of those "far more U.S. agencies" in Iraq referenced in the aforementioned FBI document was the U.S. Internal Revenue Service, as evidenced by the Washington Post article of March 21, 2004, titled, "In Iraq, IRS Agents Had the Right Stuff." (Attached as Exhibit C).  As stated in this article, an IRS agent interrogated  Saddam's half-brother Barzan Tikriti who was in U.S. military custody at the time with U.S. Detention Operations.

This public record demonstrates the falseness of the evidence offered to persuade the jury that no investigation at any level could have been conducted, without an MLAT request.

Attached, as Exhibit A, is the affidavit of Louis Freeh, former Director of the FBI, endorsing the point that is obvious from these public sources, that investigation in Iraq and Jordan at the time was not constrained as the government led the jury to believe.

But this is not all.  The government knew at that moment it advanced this proposition to the jury that this was not true.  Only a few weeks before, this very prosecutor had an FBI agent in Baghdad informally contact the attorney for Mr, Jabar in Baghdad, to check on Mr. Jabar's representations regarding  the family's efforts to pursue their claim to family property in Iraq.  The following email was marked as Defense Ex. 349.

----- الرسالة التي أعيد توجيهها -----
من: "Clark, Stephen J (Baghdad)" <ClarkSJ@state.gov>
إلى: <ibtisam.alshammary@yahoo.com" "ibtisam.alshammary@yahoo.com">
نسخة كربونية: <marie.grisanti@usdoj.gov" "marie.grisanti@usdoj.gov">
تاريخ الإرسال: الخميس 23 يونيو، 2016 2:37 م
الموضوع: Client Steve Jabar

Dear Ibtisam,

I am writing on behalf of the US Dept of Justice Attorney, Marie Grisanti, cc'd above. I was asked to present some questions to you regarding a matter before the court in the US. Would it be possible for you to provide information regarding the below questions?

1.   Can Steve Jabar appear via teleconference or Skype?
2.   Is Jabar Mohammed Ali proven to be a martyr yet?
3.   has Steve Jabar proven that he is the son of Jabar Mohammed Ali?
4.   what is the estimated value of the Jabar Mohammed Ali's property?
5.   how long will it take before a decision is made by the commission?

Your assistance is greatly appreciated and I hope to hear from you soon.

Regards

**SSA Stephen J. Clark**
**Federal Bureau of Investigation**
**Legal Attaché - U.S. Embassy**
**Baghdad, Iraq**
Work:  301-985-8841 x4204
FBI Cell:  202-497-4488
Asia Cell: 011-964-770-443-1559
(U) stephen.clark2@ic.fbi.gov
(U) clarksj@state.gov
(S) sjclark@fbi.sgov.gov
*Baghdad time is EST +8 hours (EDT +7 hours)*

Clearly the government was  aware of the ability of the FBI, even up to the present day to conduct investigations in Baghdad, but set about to persuade the jury of the opposite. The admission of this exhibit could have undone some of this.  It was excluded without any reason being stated for its exclusion.  If the point was to spare the attorney of the embarrassment of having personally misled the jury, her entitlement to which is open to question, the email could have been redacted.  But no discussion was allowed of how to create a substitute that informed the jury of this important piece of evidence that refuted the very last point made by the government in its case.

53

## C.  Inflammatory and improper argument

Knowing it was directly contrary to the instructions that the Court was going to give to the jury, the prosecutor repeatedly, stridently, indorsed the jury that each of the claimed "diversions"  of money stood as proof of the required "intent to defraud."

The AUSA frequently offered her own testimony, in an inflammatory way.  She described Debbie Bowers as having "lied" in the quarterly report. [Closing, p. 14] ("That's not true. That's another lie in this report.);

> They tell UNIFEM that they spent every cent of that 350 and then some. That's not true. Their own bank statement right there shows you. **Another lie.** Another effort to conceal what happened, to conceal the truth, to conceal the fraud that took place in this case.

[*Id.*] There was no evidence that the quarterly report asserted that all the finds expended derived directly from the UN grant.  And, on the completely unsupported pretense that the quarterly report was supposed to show something other that the expenditures on the project, "Lie. Lie.  And another lie.  Additional proof of intent to defraud in this case." [p. 15]


## D.  Deprivation of the Right to Present a Defense

We have separately outlined the parameters of the Right to Present a defense.  That right is not satisfied merely by providing a "fair trial" or "due proses" in the form of fair application of the rules of evidence.  That right, if it means anything at all, must provide more than this.  Here we have glaring proof of ulterior motives, to "neutralize" Jabar among some sort of extended government community; we have perjury before Congress targeting Jabar; we have ridiculous rumors planted with the Pentagon by officials from Buffalo that he is a "spy."  In a rational world, charges by the government against Jabar, and is co-accused, cannot be evaluated in a vacuum where this motivation is not weighed.

### 1. Exclusion of evidence and disclosure of the improper motivation of the government

In support of our Rule 17(c) subpoenas, and in response to the government's motion to quash, [Dkt. #348] we demonstrated that the there was strong evidence of a concerted effort by members of the Buffalo JTTF to "get" Steve Jabar, to the extent of getting his security clearance and country documents pulled, despite his needed service in Iraq, and putting him on the Terrorist Watch List. The evidence of this conspiracy was exponentially stronger than the hypothesis that he and Deborah Bowers would actually have proposed the radios station in order to personally profit.

We believe it was error not to allow this pointed attack on the motivations of the government, and demonstrated that the Supreme Court, in *Kyles v. Whitley*, had recognized that the defense could challenge the weight of the government's evidence on this basis. The court disagreed, obviously, and excluded the evidence we had of this overall motivation and bad faith. We disagree still, and submit that the exclusion of this, in light of the evidence at trial, was highly prejudicial, because the jury, which clearly could not follow instructions, may have decided to convict in part on the belief that the government must have had a good reason to go after Jabar.

Moreover there were reportedly hundreds of pages of potential disclosure relevant to this issue, with only a fraction provided to the defense. While it could be described as a "circus," if it was it was a "circus" of the government's own making. If there were secrets to be protected, the way to do it is to drop the case, not deprive the accused of the ability to find the whole truth about the motivations behind this prosecution.

### 2. Limiting cross examination and evidence of Agent Klimczak, and disclosure, on bias

The jury heard only part of the evidence that would be essential to evaluating the bias and motivation of Agent Klimczak – his remark to other law enforcement officers (it

55

was concealed from us who and where they are) about "neutralizing" Jabar.  Of course that is the pattern we showed, of neutralizing Jabar in Iraq and at home, "even," to quote JTTF member Humphrey, "at the risk of innocent lives."  But The Court precluded the defense from exploring Klimczak's official association of OKI with "Al Qaeda" in what may be his very first report in this case.  It is too obvious that this goes to his motivation and ulterior purpose to "neutralize" Jabar, even if it is to disrupt his life on an investigation into what, base on reality, is at most a common law larceny only prosecutable in state court.

Here again, if it required disclosing "secrets" to allow the defense to fully confront Agent Klimczak, then the government can choose whether it is more important to it to preserve such secrets to obtain a *valid* conviction which could only be had with full disclosure of those secrets.

## E.  Jury Instructions

We submit, first of all, that the evident confusion on the part of the jury, and the ability of  the government to get a verdict on one of the fraud counts, with so many holes in its proof, amply demonstrate that the manner in which the jury was instructed on the fraud charge was inadequate to effectively communicate to the jury what the elements of the offense are, and what evidence related to what elements.

We therefore reiterate all out objections to the charge and our requests to charge and the arguments we made in each direction.

But we also think that, in light of the argument and the verdict, to tell the jury merely that proof of a willful breach of an agreement is not enough "on its own," without at least specifying some quantum or quality of the additional proof required, essentially negates the entire point of the *Countrywide Home* decision and its obvious effort to crystallize the doctrine behind that ruling so it cannot be mistaken or misapplied.  As we saw here, the jury, if it paid any attention to this charge at all, thought that the existence of

any additional negative evidence was enough to get over whatever threshold there was. The entirely new claim that Bushra was "in on it" and concealed her involvement? That OKI did not file a 990 form on time?  That there may have been more, or was it less, than 11 board members?  Can the government seriously demonstrate that this mud spatter on the courtroom wall is enough to address the serious concern of the Court of Appeals, in a decision clearly intended to settle the rule, for fraud prosecutions in federal court for what amounts to a civil breach of contract?

We asked the Court at the time we originally pressed this motion, is it really going to be the case that breach of a contract *plus* "financial distress" (plus not filing a 990 form, plus misbehavior of newly discovered "co-conspirators," and so on) can turn that breach of contract into a federally cognizable "scheme to defraud"?

We think that the answer is clearly no, and a new trial is needed where the evidence is  limited to items that are truly probative, for acceptable uses.

## F.  The §1001 charges

Should the Court dismiss the fraud counts, but not the §1001 charges, there is another point needing to be made.  We have pointed out that the government's fraud case was devoted at most 1% to the actual "representations" contained in the indictment, an, became the government from its very first witness was unable to substantiate, and 99% on other "representations" and allegations of theft, not fraud, together with broadscale assassination of Deborah Bowers' character for truthfulness (and Steve Jabar's too).  So in connection with the actual  §1001 charges, the government did little more than walk Agent Klimczak through his 302 on his interviews, not even identifying in the process which statement were supposedly the "false" ones, since so many of them were undisputedly true and ingenuous. The balance of this was the evidence of the fraud and all that evidence of her supposed untruthfulness whose admissibility even on the fraud charge is highly questionable.

But all that evidence of uncharged untruthfulness, especially the Ex 30B which the government finally got into evidence after countless rebuffs, was a tidal wave of prejudice, with no probative value, that never would have been admitted had the trial only been in relation to the §1001 accusations.  Thus there was a "spillover" effect here that requires a new trial on any surviving §1001 charges.

# Conclusion

For the above reasons all the charges must be dismissed pursuant to Rule 29 and a new trial ordered pursuant to Rule 33 or an charges which remain..

Dated:  October 28, 2016

Patrick J. Brown, Esq.
LOSI & GANGI
147 Linwood Avenue
Buffalo, New York 14209
(716) 854-1446
pjbrown@Losi-Gangi.com

Respectfully submitted,
/s/ Mark J. Mahoney

Mark J. Mahoney, Esq.
HARRINGTON & MAHONEY
70 Niagara Street, 3rd Floor
Buffalo, NY   14202-3407
Ph: 716-853-3700
Facs: 716-853-3710
mjm@harringtonmahoney.com

United States District Court
Western District of New York

| | | |
|---|---|---|
| United States of America, | | |
| | *Plaintiff* | Affirmation of Louis J. Freeh in Support of Motion Pursuant to FRCrP Rules 29 and 33 |
| *vs* | | 09-Cr-170-V |
| Steve Jabar and Deborah Bowers | | |
| | *Defendants* | |

Louis J. Freeh affirms to be true, and states under penalty of perjury as follows:

1.  I am the founder and Chairman of the consulting firm Freeh Group International Solutions, LLC, established in 2007 and founder and partner of Freeh Sporkin & Sullivan, LLP a Washington, D.C. law firm, also established in 2007.  From September 2012 through December 2015 I was partner and immediate past chair of the Executive Committee of Pepper Hamilton LLP.

2.  I graduated Phi Beta Kappa from Rutgers College in 1971, Rutgers School of Law in 1974 and New York University School of Law in 1984 (L.L.M). I joined the Federal Bureau of Investigation (FBI) as a Special Agent in 1975, and was assigned to the New York City Field Division, and later at FBI Headquarters in Washington, D.C.  I served as a First Lieutenant in the United States Army Judge Advocate General Corps.

3.  In 1981, I joined the United States Attorney's Office for the Southern District of New York as an Assistant United States Attorney, later serving as Associate and Deputy United States Attorney.  In 1991, I was appointed by President George H.W. Bush as a United States District Court Judge for the Southern District of New York.

*4.*  In 1993, President William J. Clinton appointed me as the Fifth Director of the Federal Bureau of Investigation, a position I held until June of 2001.  In 2001, I joined MBNA America Bank in Delaware as vice chairman and general counsel.

5.   I am familiar with this prosecution, and the underlying charges and facts, based upon my review of the pleadings, discussions with defense counsel and former United States Army Colonel Wes Martin.

6.   Based on my experience and current knowledge, the United States Department of Justice, acting through FBI Agents (and on behalf of IRS CID Agents in related cases) assigned and operating in Iraq and Jordan from August 2006 until May 21, 2009 and up until the trial of this case this past summer, the relevant time of this investigation, could have conducted an investigation to verify the good faith defense of the defendants. Whether by means of a treaty request, or by more informal means, the United States Department Of Justice and FBI regularly conduct, and cause to be conducted, such investigations in Iraq and Jordan, and have established procedures and protocols with host country law enforcement officials in said countries to do so effectively and in a timely manner.

_____

Louis J. Freeh

25 Oct 2016



## Stories

Select Language          Get FBI Updates

Home • News • Stories • 2007 • June • Our Legal Attaché in Iraq

**Info**   This is archived material from the Federal Bureau of Investigation (FBI) website. It may contain outdated information and links may no longer function.

 Twitter     Facebook     Share

### The FBI in Iraq
### The Work of Our Legal Attaché

06/29/07



In this age of globalization, protecting the U.S. takes us to many different parts of the world.  That includes the Middle East, where we now have permanent offices in Afghanistan, Saudi Arabia, Israel, Pakistan, Jordan, Yemen, the United Arab Emirates, Qatar, and more recently, Iraq.

Our Baghdad office was officially opened in the U.S. Embassy in March 2005, though our people were on the ground in the country two years earlier.  Today, we have dozens of special agents, intelligence analysts, and other professionals in Iraq, making it one of our largest international contingents.

"Why are we in Baghdad? Because we have to be," says Special Agent Andrew R. Bland III, who served 19 months in the capital city as our first permanent overseas representative or Legal Attaché before being replaced recently by Special Agent Jim Davis.  "A lot of what happens in Iraq is pivotal to protecting the homeland, not to mention our soldiers and other Americans in Iraq itself."

**A few examples of what we do that's so pivotal:**

- We interview suspected terrorists captured by the military. These suspects may have vital information about terrorist operatives and operations both inside and outside Iraq, and possibly even in the U.S.
- We gather intelligence, which is quickly processed, analyzed, and shared, sometimes leading to still more intelligence, creating a lightning fast real-time intel cycle.  The military, in particular, increasingly relies on us for intelligence, especially about the movement of forces within the country gleaned from our investigations or other work.
- We collect evidence from crime scenes—whether it's from a massive car bomb or a mass grave.  As Davis says, "The U.S. military is made of war fighters. They don't have the expertise to collect and process evidence if they come across atrocities or major crime scenes."
- We help find kidnapped Americans. At least 13 American soldiers and civilians were kidnapped in Iraq just between October 2006 and February 2007.
- We investigate crimes committed by Americans against the Iraqi people, as well those Iraqis commit against their fellow citizens.  In concert with several other U.S. agencies, we recently created a major crimes task force that investigates some of the worst crimes committed by Iraqis against other Iraqis.
- We help train the Iraqi police and intelligence forces.

According to Davis, our work in Baghdad is different than in other countries.

First, it's probably our most dangerous overseas assignment.  Attacks on the Green Zone, where our offices are located, are common. Trips outside the zone are perilous.

Second, most of our international offices track down leads for agents in the states or in other regions of the world.  In Iraq, the work is largely self-generated: teams are actively working on cases under U.S. jurisdiction almost as soon as they're reported.

Third, there are far more U.S. agencies and actors to coordinate with in Iraq, not to mention the many international partners.  Our relationship with the military is especially symbiotic.  "The FBI can't succeed without working with the military, and the military can't succeed without working with the FBI," Bland asserts.

And the FBI can't succeed in its mission of protecting the U.S. from attack without being in Iraq…and without having a presence across the globe.

**Resources:**
- Our international offices

**Story Index**

By Date

By Subject
- Art Theft
- Civil Rights
- Counterterrorism
- Crimes Against Children
- Criminal Justice Information Services
- Cyber Crimes
- Director/FBI Leadership
- Field Cases
- Foreign Counterintelligence
- General
- History
- Intelligence
- International
- Lab/Operational Technology
- Linguist/Translation Program
- Major Thefts/Violent Crime
- Organized Crime/Drugs
- Partnerships
- Public/Community Outreach
- Public Corruption
- Recruiting/Diversity
- Responding to Your Concerns
- Technology
- Training
- White-Collar Crime

**EXHIBIT B**                    **Page 1 of 2**

# The Washington Post

# In Iraq, IRS Agents Had the Right Stuff

**By Stephen Barr**   March 21, 2004

There are a lot of hidden heroes in the war in Iraq. Among them are agents of the criminal investigation division of the Internal Revenue Service.

Shortly after the fighting in Iraq ended last year, IRS Special Agent Scott Schneider flew to Baghdad as a scout for his agency. As the first IRS financial crimes investigator on the ground there, he figured out what it would take to track down the billions of dollars stolen by Saddam Hussein and his cronies.

By September, three of Schneider's colleagues -- Jeff Sandy, Jeff James and Greg Coats -- were in Baghdad. In December, David Lazarus, Paul Robarge and Bob Taylor joined the "trace and chase" effort focused on Hussein's illegal gains.

It was difficult work in a dangerous place. And it is paying off.

Within the last year, Iraqi assets worth about $2 billion have been found and frozen outside Iraq, according to the Treasury Department. About $750 million has been returned for the country's development. About $1.3 billion in cash and valuables has been recovered in Iraq. The pursuit of the regime's illegal acquisitions, estimated at $10 billion to $40 billion by the General Accounting Office, may continue for years.

Last week, in a ceremony attended by friends and family, the seven IRS criminal investigation agents were honored by their bosses and the Defense Department.

Sandy, James, Coats, Taylor, Lazarus and Robarge received the military's Joint Civilian Service Achievement Award, the second-highest award that can be presented by military commanders. Army Lt. Col. Larry Marek, who worked with the agents in Baghdad, pinned medals on five agents at the ceremony (Lazarus was not able to attend).

Nancy J. Jardini, chief of IRS criminal investigations, presented Schneider with the "Chief's Award" -- the highest honor that the division head can bestow on an agent.

The IRS's expansion into investigations of Hussein's regime began almost a year ago, when the Treasury Department began seeking volunteers for 90-day deployments in Iraq. (James recalled that the solicitation came in an e-mail that was "cryptic

**EXHIBIT C**                    **Page 1 of 2**

enough that it didn't tell us exactly what we were in for, but we were able to read between the lines.")

Schneider went first, spending three weeks in Baghdad with minimal logistical support. He spent most of his time "trying to get an idea of what our agency would be required to provide, how to assimilate into the military environment to accomplish the mission."

He also was able to help out the military, having previously served in Army intelligence as a leader of an interrogation team specializing in Arabic languages. He interrogated Hussein's half brother, Barzan Tikriti, and other detainees pictured on the U.S. military's "deck of cards."

In the following weeks, the IRS agents went to Iraq in teams, using skills developed in dealing with white-collar criminals. They met with banking, oil and other officials in an effort to learn about the bogus companies and fictitious accounts created around the world by Hussein's regime.

"We strove to be very professional, very courteous and to treat people with a lot of respect, and I think they really did appreciate it," Robarge said. "As an example, we would walk out of an interview and someone would come up and provide additional information, turn over documents and computer files that initially they said, 'We don't have.' I think it is through our interview skills that people were able to identify with us."

To move around in Iraq, the agents relied on National Guard units from Utah and Alabama. "Without them, we could not have gone some of the places we did," Robarge said.

---

**Local Headlines newsletter**

Daily headlines about the Washington region.

Sign up

---

In most cases, a mix of personal and professional reasons led the agents to volunteer for the dangerous duty.

Sandy wanted to go, in part, because a friend's daughter had been killed in the World Trade Center attack but also because his father fought in World War II. "It was something I wanted to experience," he said.

James had a nephew in the National Guard serving in Saudi Arabia (they would later meet in Baghdad), and Robarge has a nephew who was in the ground forces that invaded Iraq.

"My generation didn't have an opportunity to serve our country in the military type of form, and if it was good enough for my nephew, it was good enough for me," Robarge said.

E-mail: barrs@washpost.com

**PAID PROMOTED STORIES**

Recommended by

**EXHIBIT C**                    **Page 2 of 2**